[No. D032125. Fourth Dist., Div. One. Apr. 19, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK TOKASH, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II.A. and II.B.

**COUNSEL**

Thomas D. Mauriello, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Niki Cox-Shaffer and Matthew C. Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—The jury convicted appellant Frank Tokash of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd.

(a)(1))[2] and battery with serious bodily injury (§ 243, subd. (d)) on Tommy Doan, and found true the allegations that Tokash personally inflicted great bodily injury during the assault (§ 12022.7, subd. (a)) and personally inflicted great bodily injury that caused Doan to become comatose. (§ 12022.7, subd. (b).)

Tokash contends the trial court erroneously excluded evidence of Doan's drug use and erred in its instructions on assault. He also contends there is insufficient evidence to support the section 12022.7, subdivision (b) enhancement.

I

FACTS

A. *Prosecution Case*

Tokash was charged with seriously injuring Doan during a melee outside a San Diego nightclub. Tokash's defense was that he was not the person who struck Doan.

1. *The Fight*

On the night of November 29, 1997, several bands played at a nightclub. Tokash and his friend Chuck Leek attended the nightclub and heckled the musicians. After the musicians finished playing, they went outside and began loading their equipment into cars. Leek stood near the door staring threateningly at them.

The club owner and Leek were standing at the front door when Jonathan Doan (Jonathan), one of the musicians and Doan's brother, approached the club owner and thanked him for allowing them to play. Jonathan offered his hand to Leek, saying he was sorry Leek did not like the music. Leek refused the handshake and cursed Jonathan. Chris Fomon, a friend of Jonathan's, chastised Leek for refusing to shake hands. Leek responded by threatening Fomon. The club owner pulled Leek inside and Jonathan and Fomon returned to their cars.

A few minutes later, as Jonathan, Doan and the other musicians were standing near their cars, Leek and Tokash came outside the nightclub; Leek charged the group and took a swing at Fomon. Although the punch missed Fomon, Leek knocked him to the ground with his body and the two began wrestling.

---

[2]All further statutory references are to the Penal Code unless otherwise specified.

Jonathan testified that during this melee, Tokash ran toward Doan and punched him in the face with a "right cross." Jonathan did not see the blow actually land, but did see Tokash lunge at Doan, swinging his arm at Doan's face; Jonathan heard an immediate "pop" and saw Doan fall to the ground.[3] Jonathan ran to Doan, who was bleeding from his mouth and nose. Tokash left a few minutes later in a vehicle but bystanders recorded the license plate number.[4]

### 2. The Injuries

An ambulance arrived minutes after Doan was struck. At the time he arrived at University of California at San Diego Medical Center he was close to a full coma and did not have a secure airway. Doan suffered a broken nose and a serious head injury. Doctors performed an emergency craniotomy to relieve the swelling from both a subdural and epidural hematoma. After these procedures Doan was in critical condition and was kept in a coma with drugs to control pressure on his brain. The doctor testified that Doan suffered a broken nose and that this injury occurred immediately before he suffered the head injury.

### B. Defense Case

The defense argued misidentification. Tokash's wife, Kristine, was at the nightclub with Tokash, Leek and Leek's wife. As they left the bar Fomon challenged Leek to fight, and a struggle ensued. Kristine testified that others were involved in the fight, kicking and punching, and that Tokash was involved only in trying to pull people off of Leek. She watched Tokash during the entire scuffle and he never struck anyone.

Dawn and Jason Turnage were at the nightclub with the Tokashes and the Leeks. At the end of the night the club owner told Tokash and Jason that Leek was in a fight outside and asked them to break up the fight. Dawn followed Tokash and Jason outside and saw several people scuffling on the ground while others were trying to pull the combatants apart. She then noticed Doan lying on the ground. Tokash was near the fight but Dawn did not see him strike anyone. Jason testified the club owner asked him to go outside after Leek. Jason saw Leek being attacked by several people, whom Jason and Tokash tried to pull off of Leek. Jason did not see Tokash strike

---

[3]Other witnesses testified that Tokash blindsided Doan, hitting him directly in the face, and that Doan immediately fell to the ground after being struck.

[4]Police traced the license plate number and later arrested Tokash. He waived his *Miranda* rights and at first denied being present. When confronted with contrary witness statements, Tokash changed his story and claimed several people were beating up a male and he was trying to break up the fight. He denied throwing any punches.

anyone. Jonathan later accused Jason of hitting Doan,[5] and when Jason denied culpability, Jonathan asked him "[w]ho hit my brother?"

David Quinn, a bartender, testified the club owner ran into the nightclub, stated a fight was occurring outside and asked Quinn to help break it up. Quinn went outside and saw Doan lying on the ground being tended by several people. After police arrived a band member pointed at Jason and stated, "He's the one." However, when an officer started to handcuff Jason a second officer asked whether the witness was sure and the witness responded "no."

II

ANALYSIS

A., B.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

C. *The Section 12022.7, Subdivision (b) Enhancement*

■ The jury found true the section 12022.7, subdivision (b) allegation that Tokash, in committing the charged offense, inflicted great bodily injury that caused Doan to become comatose. Tokash contends the true findings must be reversed because (1) as a factual matter there is insufficient evidence that the injury he inflicted caused Doan to become comatose, and (2) as a matter of statutory interpretation the comatose state must be permanent and Doan was not rendered permanently comatose by the assault.

Tokash's factual claim rests on Doan's medical condition when Doan arrived at the hospital. The doctor testified Doan had a decreased level of consciousness and a Glasgow Coma Scale of nine. Tokash then cites medical literature, of which judicial notice was taken by this court, stating a Glasgow Coma Scale of eight or less is the accepted definition of the comatose patient. However, the treating doctor also stated that after Doan was intubated a CT scan revealed a severe closed head injury, necessitating an emergency craniotomy to drain both a subdural and epidural hematoma, as well as resecting a portion of Doan's brain that did not appear salvageable. Significantly, the doctor testified that to save Doan's life, it was medically necessary to keep him "chemically in a coma with paralytics and sedatives" for two months after the emergency surgery. Even assuming Doan's condition had not degenerated into a medically defined coma at the time he was

---

[5]Jason also heard Jonathan accuse a Mr. Butler of hitting Doan.
*See footnote 1, *ante*, page 1373.

admitted to the hospital, the testimony that Doan was in a postsurgical coma for two months supports the factual determination that Tokash inflicted great bodily injury, causing Doan to become comatose due to the brain injury.

Tokash's statutory construction argument rests on the language of section 12022.7, subdivision (b), which provides: "Any person found to have inflicted great bodily injury . . . which causes the victim to become comatose due to brain injury or to suffer paralysis, as defined in Section 12022.9, of a permanent nature, shall be punished by an additional and consecutive term of five years."

Tokash argues the enhancement by its language applies only if the victim's comatose state is "of a permanent nature." Respondent counters that the phrase "of a permanent nature" was not intended to modify the word "comatose" but only the word "paralysis," the alternative basis for the enhancement.

We conclude, based on the legislative history of the statute as well as the language employed, that the phrase "of a permanent nature" was intended to modify only "paralysis." First, the evolution of the legislative language after the bill's original introduction, which can offer "considerable enlightenment as to legislative intent" (*People v. Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15]), confirms the Legislature did not intend to limit the enhancement to victims in permanent comas. Subdivision (b) of section 12022.7 was added by the enactment of Senate Bill No. 529. (Stats. 1993, ch. 607, § 2, p. 3260.) As originally introduced in the Legislature, the subdivision (b) enhancement applied only if the injury caused the victim to "become clinically brain dead," connoting a permanent state. (Sen. Amend. to Sen. Bill No. 529 (1993-1994 Reg. Sess.) May 20, 1993 at <http://www.leginfo.ca.gov/> [as of Feb. 22, 2000].) During the legislative process, the phrase "clinically brain dead" was replaced with the word "comatose." (Assem. Amend. to Sen. Bill No. 529 (1993-1994 Reg. Sess.) July 15, 1993 at <http://www.leginfo.ca.gov/> [as of Feb. 22, 2000].) The change in terminology from brain dead to comatose demonstrated an intent that the enhancement applied even though the victim's comatose condition was not permanent and irreversible.

Additionally, the floor analysis of Senate Bill No. 529, which we may also consult to construe the legislative intent (*People v. Broussard* (1993) 5 Cal.4th 1067, 1075 [22 Cal.Rptr.2d 278, 856 P.2d 1134]), confirms the "permanent nature" language was intended to apply to paralyzed rather than comatose victims. The floor analysis in the Senate (see Sen. Com. on Public Safety, 3d reading analysis of Sen. Bill No. 529 (1993-1994 Reg. Sess.) as

amended Sept. 3, 1993, par. 2 at <http://www.leginfo.ca.gov/> [as of Feb. 22, 2000]) contained language stating: "This bill: [¶] . . . [¶]

"2) Adds a five year enhancement for intentional infliction of great bodily injury causing the victim to be comatose due to brain injury or suffer permanent paralysis . . . ."

The legislative history convinces us the Legislature intended the word "permanent" to modify the term "paralysis" but not the term "comatose."[7]

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 16, 2000.

---

[7]Moreover, Tokash's construction places a grammatically awkward and unusual sentence structure on the statute. Under Tokash's interpretation, subdivision (b) of section 12022.7 would state that the enhancement applies when the victim "become[s] comatose . . . of a permanent nature." The phrase "of a permanent nature" is a prepositional phrase; a prepositional phrase ordinarily modifies nouns or pronouns. (American Heritage Dict. (2d ed. 1985) p. 978.) Although the word "paralysis" is a noun (*id.* at p. 900) and is properly modified by a prepositional phrase, the word "comatose" is an adjective (*id.* at p. 294), which is not ordinarily modified by a prepositional phrase. Under Tokash's construction, the Legislature employed a prepositional phrase to modify an adjective when it could have been grammatically correct by stating the enhancement applied when a victim's condition becomes "permanently comatose," had that been its intention. It would be grammatically correct if the term "of a permanent nature" was interpreted to modify "brain injury" as well as "paralysis," but Tokash does not assert this interpretation and the legislative history does not support it.