[No. E042254. Fourth Dist., Div. Two. Nov. 25, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS ALBERTO GALVAN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV.

## COUNSEL

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Alberto Galvan.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Jose Roberto Zaiza.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HOLLENHORST, Acting P. J.**—Following a jury trial, defendants Jesus Alberto Galvan (defendant Galvan) and Jose Roberto Zaiza (defendant Zaiza) were convicted of attempted murder (Pen. Code, §§ 187, subd. (a), 664),[1] torture (§ 206), burglary (§ 459), and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury also found that defendants personally caused great bodily injury (§ 12022.7, subd. (b)). The trial court found that defendant Zaiza had a prior strike conviction within the meaning of section 667. The trial court sentenced defendant Galvan to a term of life with the possibility of parole (minimum serving period of 15 years), plus a consecutive term of five years. It sentenced defendant Zaiza to a term of life with the possibility of parole (minimum serving period of 30 years), plus a consecutive term of five years.

Both defendants appeal.

## I.  PROCEDURAL BACKGROUND AND FACTS

### A.  *The Prosecution's Case*

Mukesh Patel (Mukesh) operated the Brazil Market, a mini-mart, on Chandler Street in Corona.[2] The incident in question occurred at the mini-mart. He was working with two other employees, Meena Patel (Meena) and Victor Ladino (Ladino). Aurelio Lobato (Lobato) was working at Tacqueria Amigos, a business adjacent to the Brazil Market.

Around 8:00 p.m. on February 28, 2004, two men[3] were trying to open the door of a pickup truck with a flat piece of metal. One of the men had locked his keys inside the truck while it was parked in front of the Brazil Market. Three or four men approached one of the two men[4] and began beating him, first hitting him in the face and then knocking him to the ground and kicking him. The man's face was injured and he was bleeding from the nose.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Some of the witnesses called the area Eastvale.
[3] The men were later identified as Mario Montoya and Jorge Gonzales.
[4] The other man ran away.

Lobato told the men to stop. Some of the men, later identified as defendants, began to chase Lobato, who had emerged from Tacqueria Amigos. Lobato ran into the Brazil Market and defendants followed. Lobato told Meena, who was behind the counter, to call 911. Lobato ran down the aisle as the men followed. They were knocking over a shelf and throwing items. Defendants grabbed Lobato, pushed him to the ground, and dragged him to the back of the store near the back entrance. They started hitting and kicking Lobato, who was lying on the ground trying to shield his face and head with his hands. Lobato identified both defendants as his attackers.

Fidel Chavez (Chavez), a 51-year-old baker who was delivering bread to the store, yelled at defendants to leave Lobato alone. Defendants chased after Chavez, grabbing and throwing him to the ground and then beating and kicking him. Simultaneously, Ladino ran from the store. Lobato locked himself inside the beer cooler and hid. He had scrapes and abrasions on his face and lost several teeth as a result of the beating. Defendants continued to beat and kick Chavez after he was lying defenseless on the ground.

Eventually, Meena heard Ladino scream and found him in the back room of the mini-mart trying to help Chavez, who was bleeding and unconscious. Meena called 911. Mukesh tried to stop Chavez's bleeding with towels.

When the first Riverside County Sheriff's Department deputy arrived, he heard screams coming from the market and found Chavez inside lying in a pool of blood. Chavez was not breathing. He had a large gash on the side of his head and a large laceration under one eye. He was bleeding heavily. The deputy applied pressure to stop the bleeding until paramedics arrived.

Dr. Michael Bear treated Chavez at Corona Regional Medical Center. Chavez was unconscious and unresponsive upon arrival. He had no response to painful stimuli and no gag reflex. His pupils were unresponsive to light and he had fluid in his lungs. He was treated to restore his airway.

The Glasgow Coma Scale is used to measure the level of brain impairment. A normal score is 15; at the hospital, Chavez scored a three, the lowest possible score. Chavez suffered a seizure before arriving in the emergency room and another after he arrived. The seizure started in his right arm and progressed to his right leg before spreading to the rest of his body, indicating a probable injury to the left side of his brain. He was given medication to control the seizures. Chavez had a laceration over his right ear and another near his left eyebrow. There were a scrape and abrasion below his left eye and bruises on his face and left shoulder. Chavez's condition was "very grave." If he had not received prompt medical attention, he would have died from the injuries. He was transferred to a trauma center.

Chavez remained in a coma for more than a week and was in intensive care during that time. He was hospitalized for several weeks. He required stitches above the eye and 30 to 35 staples to the side of his head. He also had bruising to his right side. Chavez does not remember the attack. Cynthia, his daughter, testified that her father is no longer able to function independently. He cannot drive, suffers from memory loss, and is no longer able to run his business.

Ladino told Detective Gary Bowen that he knew Chavez's assailants from the neighborhood. Ladino accompanied a sheriff's deputy to a house near Chandler and Sebly. He told police that one of the defendants lived at 14519 Chandler Avenue. Two of defendant Zaiza's cousins, Benjamin and Francisco Sandoval, lived at that address. The Sandovals were admitted members of the Mira Loma Young Crowd, a street gang. They were also identified as having been in front of the Brazil Market at the time of the attack. Using a photographic lineup, Ladino identified defendants as two of the men involved in the incident.[5] At trial, Ladino recalled the person whom he identified from a photographic lineup as one of the suspects who hit the man by the truck. He also recalled the person whom he identified from a photographic lineup in People's exhibit No. 54 was one of the defendants who followed Lobato into the store. However, Ladino denied that he identified defendants in People's exhibit Nos. 53 and 54 as the persons who had hit and kicked Chavez. He denied seeing anyone beating Chavez, claiming that he had already run away. He also denied telling the police that he had seen defendants before or that he had led the police to the home of one of the defendants. He admitted being somewhat fearful of retaliation for his testimony.

In a taped interview with Detective Eric Holland, defendant Galvan admitted that he was at the Brazil Market when the attack took place. Defendant Galvan said that earlier that day, two men were walking down Chandler Avenue and one threw a beer bottle into the street. Defendant Galvan said he considered that an act of disrespect. Later that day, defendant Galvan saw the same men in front of the Brazil Market near a red pickup truck. He thought the men were trying to "jack" the vehicle. Defendant Galvan said that he confronted the two, and one of them hit him in the back of the head and struck him in the shin and shoulder with a metal bar. He did not call the police. Defendant Galvan claimed to have gone into the mini-mart but not the back storeroom. He also claimed that he did not see the older man who was beaten there.

---

[5] However, during trial, Ladino did not recall pointing out a house or identifying defendants as the assailants. On the day following Ladino's testimony, the interpreter testified that defendant Galvan was looking at Ladino in an intimidating manner. Ladino acknowledged that he was fearful.

At trial, Lobato identified defendants as the two men who assaulted all of the victims. He admitted that he told police at the time of the incident that the attack happened so fast that he would not be able to identify his attackers either in person or by picture. He was never shown any photographs or asked to make an identification of his attackers before the trial. He testified that he had never seen them before the attack.

### B. *Predicate Crimes/Gang Testimony*

On January 17, 2004, Francisco Alvarado was assaulted at a house party on Urbana Street in Mira Loma. As Alvarado was leaving the party, he saw some men beating his cousin, Jovanni Soto. The group was kicking and hitting Soto repeatedly while he was lying on the ground unable to defend himself. When Alvarado asked why Soto was being assaulted, defendant Zaiza hit Alvarado with a pistol, knocking him unconscious. The group then kicked and beat Alvarado while he was lying on the ground. The police were called and the group fled. Alvarado suffered several puncture wounds, a large head laceration and a torn earlobe. Alvarado identified defendant Zaiza from a photographic lineup.[6] A videotape taken at the party confirmed defendant Zaiza's presence at the scene before the attack. Alvarado watched the videotape with detectives and pointed out defendant Zaiza as the man who hit Alvarado with the gun.

Riverside County Sheriff's Department Corporal Brian Robertson, a gang expert, testified that he was familiar with the Mira Loma Young Crowd. At the time of the attack on Chavez, there were six members. The Brazil Market was considered within the gang's "turf." The corporal testified about gangs in general. He also testified that "pack crimes" involve a victim being attacked by a group, and any person who comes to the victim's aid is also likely to be attacked. This intimidates others from intervening. Corporal Robertson opined that the Urbana Street attack and the attack on Chavez were committed for the benefit of a street gang, namely, sending a message to the victim, witnesses, and the community in general. Both defendants had gang-related tattoos on their faces, necks and hands. Both defendants admitted being members of the Mira Loma Young Crowd. Defendant Galvan's moniker is "Sneaky," and defendant Zaiza's moniker is "Grumpy." Defendant Zaiza was convicted of voluntary manslaughter in 1996.

### C. *The Defense*

John Robles, a defense investigator for defendant Zaiza, testified that he showed Lobato copies of the photographic lineups and that Lobato was

---

[6] Alvarado identified defendant Zaiza in court based on memory of Zaiza's tattoo.

unable to identify either defendant as being one of the men he saw assault Chavez at the Brazil Market.

### D. *Rebuttal*

Detective Holland testified that it is not uncommon for a witness to be initially unable to identify a suspect from a photograph but later be able to identify him or her in person. The available photographs may be old booking photographs or Department of Motor Vehicle photographs, which may not depict the suspect in the same way as he or she appeared when the witness observed the incident.

### II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V. INFLICTION OF GREAT BODILY INJURY ENHANCEMENT

The prosecution alleged, and the jury found the allegations true, that defendants personally inflicted great bodily injury upon Chavez, which caused him to become comatose due to brain injury within the meaning of section 12022.7, subdivision (b). Section 12022.7, subdivision (b), in relevant part, provides: "Any person who personally inflicts great bodily injury . . . which causes the victim *to become comatose due to brain injury or to suffer paralysis of a permanent nature*, shall be punished by an additional and consecutive term of imprisonment in the state prison for five years." (Italics added.) Thus, based on the jury's true finding, the trial court enhanced each defendant's sentence on the attempted murder conviction with a five-year sentence. On appeal, defendant Zaiza contends the five-year enhancement is inapplicable because Chavez's comatose condition was not permanent. He argues the trial court misinterpreted the language in the statute.

■ "'Matters of interpreting and applying a statute are questions of law. [Citations.]' [Citation.] Questions of law are reviewed under the de novo standard of review. [Citation.]" (*People v. Whaley* (2008) 160 Cal.App.4th 779, 792 [73 Cal.Rptr.3d 133].)

"In interpreting a statute, our objective is 'to ascertain and effectuate legislative intent.' [Citation.] To the extent the language in the statute may be unclear, we look to legislative history and the statutory scheme of which the statute is a part. [Citation.] We consider the entire statutory scheme in

---

*See footnote, *ante*, page 846.

interpreting particular provisions 'so that the whole may be harmonized and retain effectiveness.' [Citation.] 'In the end, we " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" ' [Citation.]" (*People v. Garcia* (2008) 160 Cal.App.4th 124, 131 [72 Cal.Rptr.3d 544].)

The words at issue are: "*. . . to become comatose due to brain injury or to suffer paralysis of a permanent nature.*" (§ 12022.7, subd. (b), italics added.) According to defendant Zaiza's construction, the phrase "of a permanent nature" modifies both "comatose" and "paralysis." The People disagree, arguing that the phrase "of a permanent nature" was not intended to modify the word "comatose" but only the word "paralysis," the alternative basis for the enhancement. We agree with the People.

Nothing in section 12022.7, subdivision (b), states or implies that becoming comatose due to brain injury must be of a permanent nature. Defendant Zaiza correctly notes that our colleagues in Division One of this district addressed this issue in *People v. Tokash* (2000) 79 Cal.App.4th 1373, 1378–1379 [94 Cal.Rptr.2d 814] (*Tokash*), and concluded the same: "We conclude, based on the legislative history of the statute as well as the language employed, that the phrase 'of a permanent nature' was intended to modify only 'paralysis.' First, the evolution of the legislative language after the bill's original introduction, which can offer 'considerable enlightenment as to legislative intent' [citation], confirms the Legislature did not intend to limit the enhancement to victims in permanent comas. Subdivision (b) of section 12022.7 was added by the enactment of Senate Bill No. 529. (Stats. 1993, ch. 607, § 2, p. 3260.) As originally introduced in the Legislature, the subdivision (b) enhancement applied only if the injury caused the victim to 'become clinically brain dead,' connoting a permanent state. [Citation.] During the legislative process, the phrase 'clinically brain dead' was replaced with the word 'comatose.' [Citation.] The change in terminology from brain dead to comatose demonstrated. an intent that the enhancement applied even though the victim's comatose condition was not permanent and irreversible.

"Additionally, the floor analysis of Senate Bill No. 529, which we may also consult to construe the legislative intent [citation], confirms the 'permanent nature' language was intended to apply to paralyzed rather than comatose victims. The floor analysis in the Senate [citation] contained language stating: 'THIS BILL: [¶] . . . [¶] 2) Adds a five year enhancement for intentional infliction of great bodily injury causing the victim to be comatose due to brain injury or suffer permanent paralysis . . . .' [¶] The legislative history convinces us the Legislature intended the word 'permanent' to modify the

term 'paralysis' but not the term 'comatose.' " (*Tokash, supra,* 79 Cal.App.4th at pp. 1378–1379, fn. omitted.)[8]

At the time the *Tokash* court reviewed the language in section 12022.7, subdivision (b), that section, in relevant part, provided: " 'Any person found to have inflicted great bodily injury . . . which causes the victim *to become comatose due to brain injury or to suffer paralysis, as defined in [s]ection 12022.9, of a permanent nature,* shall be punished by an additional and consecutive term of five years.' " (*Tokash, supra,* 79 Cal.App.4th at p. 1378, italics added [discussing former § 12022.7, subd. (b)].) After the *Tokash* decision, the Legislature amended the language in the section to provide the current language as noted above. Given this amendment, defendant Zaiza argues, "The [L]egislature had the opportunity to clarify its meaning by simply rewriting the statute to state, 'or to suffer permanent paralysis,' but instead kept the modifying 'of a permanent nature' after both provisions. . . . Inasmuch as the ambiguity debate was apparently prompted by the placement of the deleted provision, it can be argued that the [L]egislature's removal of the phrase was done so that the permanency provision would clearly apply to both conditions."

■    Defendant Zaiza's position would require a finding that the Legislature, in deleting the phrase "*as defined in [s]ection 12022.9*" from the language in section 12022.7, subdivision (b), implied that the phrase "of a permanent nature" would modify "comatose" as well as "paralysis," so that it would have exactly the opposite meaning *Tokash* divined. We disagree. "An implied amendment or repeal of a code section is generally disfavored. [Citation.]" (*People v. Wood* (1998) 62 Cal.App.4th 1262, 1270 [73 Cal.Rptr.2d 308].) We presume that the Legislature, when enacting a statute, is aware of related code sections and intends to maintain a consistent body of rules. (*Ibid.*) We also presume that the Legislature is aware of judicial interpretations of a statute. " 'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that

---

[8] Defendant Zaiza acknowledges the legislative history of the statute, specifically, the decision to use the word "comatose" instead of "clinically brain dead." On October 1, 2007, defendant Zaiza requested this court, pursuant to Evidence Code sections 451, 452 and 459, to take judicial notice of three articles: "1. Encyclopedia of Death and Dying, at www.deathreference.com/Bl-Ce/Brain-Death.html[;] 2. Ad Hoc Committee of the Harvard Medical School, 'The Harvard Committee Criteria for Determination of Death.' In *Opposing Viewpoint Sources, Death/Dying,* Vol. 1, St. Paul, MN: Greenhaven Press. 1984'; [and] 3. 'Brain (Stem) Death.' In John Walton, Jeremiah Barondess, and Stephen Lock eds., *The Oxford Medical Companion,* New York: Oxford University Press, 1994."

The People opposed this request by letter brief filed with this court on October 11, 2007. The request for judicial notice is denied. The articles are irrelevant to our resolution of defendant Zaiza's issue.

statute. [Citation.]' [Citations.]" (*People v. Ledesma* (1997) 16 Cal.4th 90, 100–101 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) Absent any direct proof that the Legislature rejected the *Tokash* court's interpretation of section 12022.7, subdivision (b), we conclude that *Tokash* continues to be both viable and controlling with regards to the interpretation of the phrase ". . . *to become comatose due to brain injury or to suffer paralysis of a permanent nature* . . . ." (§ 12022.7, subd. (b), italics added.)

Moreover, nothing in Assembly Bill No. 2173 (2001–2002 Reg. Sess.), enacted in 2002, or its legislative history, indicates the Legislature intended to modify the judicial construction of the statute as stated in *Tokash* to require a permanent comatose state in order to impose the enhancement. According to the legislative history, one of the key issues in the bill was whether "numerous firearm and related injury enhancement sections and subdivisions [should] be rewritten or amended so as to eliminate redundant, superfluous or inconsistent provisions." (Sen. Amend. to Assem. Bill No. 2173 (2001–2002 Reg. Sess.) June 11, 2002, capitalization omitted.) The bill's author argued that the bill is necessary to "eliminate[] certain archaic and redundant statutory phrases." (*Ibid.*) Looking at the final version of section 12022.7, subdivision (b), we note the stated purpose of Assembly Bill No. 2173 accomplished its goal, i.e., the phrase "as defined in [s]ection 12022.9" was eliminated.

■ Given the above, defendant Zaiza's argument that the 2002 amendment indicates a legislative intent to require a permanent comatose state is without merit. The section 12022.7, subdivision (b), enhancement applies to comatose victims, whether the state of their coma is permanent or not.

## VI. CORRECTION OF THE ABSTRACT OF JUDGMENT

Defendant Zaiza contends, and the People concede, that the abstract of judgment erroneously indicates he was convicted of aggravated mayhem (§ 205) per the original charged count instead of torture (§ 206) per the amended information. We therefore order the abstract of judgment to be corrected to properly reflect the crime of which he was convicted. (*People v. Mitchell* (2001) 26 Cal.4th 181, 187–188 [109 Cal.Rptr.2d 303, 26 P.3d 1040]; *People v. Jenkins* (2001) 86 Cal.App.4th 699, 702, 707–708 [104 Cal.Rptr.2d 77].)

## VII. DISPOSITION

The matter is remanded to the trial court with directions to strike the language which indicates that defendant Zaiza was convicted of aggravated

mayhem pursuant to section 205, and replace it with language reflecting that he was convicted of torture pursuant to section 206. The clerk of the superior court is directed to modify the abstract of judgment to reflect these changes and then to forward a certified copy of the amended abstract of judgment to California's Department of Corrections and Rehabilitation. (§§ 1213, 1216.) In all other respects, the judgment is affirmed.

Gaut, J., and King, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 18, 2009, S168885. George, C. J., did not participate therein.