[No. C064571. Third Dist. Feb. 5, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO MASON DELGADO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, III and V.

### COUNSEL

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**MAURO, J.**—A jury convicted defendant Antonio Mason Delgado of attempted murder, mayhem, second degree robbery, assault by means of force likely to cause great bodily injury, conspiracy to commit a felony, and

criminal street gang activity. The jury also found that defendant committed the crimes for the benefit of a criminal street gang, and that he personally inflicted great bodily injury which caused the victim to become comatose due to brain injury. The trial court sentenced defendant to 28 years four months in state prison.

Defendant contends (1) his conviction for attempted murder must be reversed because the evidence is insufficient to prove that he harbored the specific intent to kill, or that he aided and abetted attempted murder; (2) there is insufficient evidence that he committed the charged crimes for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b);[1] (3) he was denied due process when evidence of a prior bad act was presented to the jury, despite the trial court's prior ruling excluding the evidence; (4) there is insufficient evidence to support the great bodily injury enhancement because there is no substantial evidence that the victim became comatose due to brain injury, as required by section 12022.7, subdivision (b); and (5) alternatively, there is insufficient evidence to support the great bodily injury enhancement because there is no substantial evidence that defendant personally inflicted great bodily injury.

In the published portion of our opinion, we agree with defendant that there is insufficient evidence to support the great bodily injury enhancement because there is no substantial evidence that the victim became comatose due to brain injury, as required by section 12022.7, subdivision (b).

In the unpublished portion of our opinion, we conclude there is substantial evidence that defendant harbored the specific intent to kill the victim, and that he aided and abetted his cohort in committing the other charged crimes, the natural and probable consequences of which was attempted murder; there is substantial evidence that the beating was committed for the benefit of defendant's criminal street gang; admission of the prior bad act evidence was not prejudicial error; and because we agree with defendant that there is insufficient evidence to support the great bodily injury enhancement, it is not necessary to address his alternative contention that there is insufficient evidence that he personally inflicted great bodily injury.

We will strike the great bodily injury (§ 12022.7, subd. (b)) enhancement. In all other respects, we will affirm the judgment. We will also direct the trial court to correct a typographical error in the abstract of judgment.

## BACKGROUND

David Eid was driving on West Capitol Avenue in West Sacramento around 3:00 a.m. on January 21, 2009, when he saw three men engaged in what he

---

[1] Undesignated statutory references are to the Penal Code.

thought was horseplay. As he drove by, however, it looked like it was getting excessive because one of the men was down on the ground and the others were hitting him. Eid looked in his rearview mirror and saw the two men viciously punching and kicking the man on the ground. One man was at the victim's feet and was kicking him in the lower body and crotch. The other man was at the victim's head, "doing more of the beating on the head" and "really working on him." The men were kicking the victim and appeared to be enjoying it.

Eid made a U-turn and drove back. The victim was not moving, appeared to be "out cold," and the two men were hitting and kicking him around like a "rag doll." It was "pretty brutal" and they were "giving it all they had." The attack was not constant; the men would step back, then kick and hit the victim again. Eid gunned his engine and when the men saw that Eid was going to stop his truck, they took off running. Eid did not get a good look at their faces, but one man, who was wearing a baseball cap, had a look of defiance.

Eid called 9-1-1 and told the dispatcher that the victim, later identified as Jacques Harpst, was "having a hard time breathing," was "gurgling," and was "not responsive." Harpst's pockets were pulled out and Eid thought the two men "might have rolled him."

Officer Jack Hatton responded to the scene. Harpst was bleeding profusely from his mouth and nose, and both of his eyes were swollen to the size of golf balls. Harpst made gurgling sounds as he tried to breathe. Hatton suspected defendant, who lived a block away, was involved. A subsequent investigation proved that his suspicions were correct, and that defendant's accomplice was Michael Romero.

Harpst, age 48, did not recall the beating but remembered waking up in the hospital and being there for several months. Harpst was in the neurosurgery intensive care unit at UC Davis Medical Center. According to his brother Michael, Harpst was not "conscious" when Michael first came to visit him in the hospital, and Harpst had tubes down his throat. Michael remembered Harpst becoming "conscious" a couple of weeks after the attack, when Harpst began moving his eyes and arms and began fighting to get out of his restraints. According to Michael, the beating altered Harpst's memory, hearing, sense of smell and ability to use a computer.

Dr. David Shatz, a trauma surgeon, was one of the health care providers who treated Harpst. A trauma surgeon takes care of the most severely injured patients, and when certain criteria are met, paramedics take a patient directly to a trauma center rather than a standard emergency room. Dr. Shatz saw Harpst when he first arrived, and based on a review of Harpst's medical charts, Dr. Shatz testified that Harpst had facial fractures and "a depressed mental status."

Dr. Shatz described the Glasgow Coma Scale, which physicians use to grade degrees of brain impairment. The Glasgow Coma Scale takes into account three aspects: the ability to move, the ability to speak, and the ability to move one's eyes around. The worst score a person can have is one point in each of the three categories, a Glasgow Coma Scale score of three. A person with a score of three is "totally comatose." According to Dr. Shatz, a dead body would have a score of three. The best possible score, the score for a normal healthy person, is a score of 15. A drunk person would likely score a 14. A score of eight means the brain is severely injured and the person cannot protect his or her airway from aspirating vomit.

Dr. Shatz said Harpst scored a nine on the Glasgow Coma Scale, which reflected a severe brain injury. Because of the severe injury, doctors opted to intubate him to protect his airway. When the prosecutor asked Dr. Shatz if it was fair to say in layman's terms that Harpst was comatose, the doctor replied, "I will stick with the scale." Harpst remained on a ventilator for a few days, and was in the intensive care unit for a month. Dr. Shatz testified that Harpst was "conscious" during the month he was in the intensive care unit, but Harpst was unable to push the nursing button for assistance.

Detective Warren Estrada interviewed defendant's girlfriend, Vanessa Ramos, and a recording of the interview was played for the jury. Ramos also testified at trial, although she was less forthcoming than in her interview with Estrada. Ramos identified Romero as the man who was with defendant when Harpst was beaten. She stated that defendant had been a member of the Red Nose Pittz, a Norteño gang, for a number of years. The Red Nose Pittz liked to jump people. In fact, defendant's brother was locked up for assaulting a light-rail inspector. Ramos stated the gang will beat up whoever "talks shit to [th]em" or happens to walk by when the gang members are drunk.

On the night in question, Ramos was with defendant, Romero and Erica Raya at Raya's apartment. Defendant was wearing a cap and a white jacket, and Romero had on a dark jacket. Defendant and Romero walked to Del Taco and returned about 1:00 a.m. They all sat around talking and then the two men left to "bum a cigarette" off someone. Defendant and Romero returned around 2:00 or 3:00 a.m. Romero was out of breath and immediately went

into the bathroom because he had blood on his hands. He also had a tooth in his fist; Romero removed the tooth and put it in his wallet.

Defendant told Ramos he asked a guy walking by for a cigarette and the guy "flipped out." Romero said he ran up to the guy because he thought the guy was going to hit defendant. Ramos asked if defendant hit the guy, and defendant said "no," but then said "yes." Defendant said Romero kept hitting the guy. According to Ramos, Romero appeared "fucking happy that he hit the guy or something." Ramos also said defendant told her he wanted a cigarette, but then wanted to see if the guy had any money. She told him it was "hella stupid" to rob people. Defendant asked Ramos to check if he had blood on his white jacket but she did not see any.

According to Raya, when defendant and Romero returned to her apartment they said they had beaten a guy who reacted badly when defendant asked for a cigarette. They all spent the night at Raya's place, and later on that morning she heard defendant say they beat up the guy and robbed him.

Detective Estrada interviewed defendant in February 2009, and a redacted recording of the interview was played for the jury. Initially, defendant denied hitting Harpst. But defendant eventually said he hit Harpst's neck or face once at the beginning of the altercation, and that Romero did most of the fighting. Defendant thought Romero probably believed Harpst was disrespecting him when Harpst "flipped out" about their request for a cigarette and then threw one at defendant. When Detective Estrada asked what defendant would do if someone disrespected him in front of his "homeboys," defendant said, "You disrespect them back." Defendant said rumors were going around about the fight, and people said the victim was dead or brain-dead.

Officer Anthony Herrera also interviewed defendant. Defendant told Officer Herrera the altercation started because the victim disrespected defendant by throwing cigarettes at him. Defendant said he hit Harpst a few times, but mainly in the leg area. According to defendant, Romero stomped on Harpst's head.

Officer Herrera's main focus during the interview was on defendant's gang activity. Defendant belonged to the Red Nose Pittz and his gang friends called him Ryda because he was willing "to ride for the gang," which meant to commit crimes for them. Defendant admitted that he and other gang members would beat up and rob people; it was part of being in the gang. During one of defendant's previous contacts with Officer Herrera, he told Officer Herrera they committed crimes to show the Broderick Boys that the Red Nose Pittz were worthy of being Norteños in the Broderick area, and because they were tired of getting beaten up by the Broderick Boys. The Broderick Boys were the predominant gang in the West Sacramento area.

Officer Michael Duggins testified as a gang expert regarding Norteños in general, and the Red Nose Pittz in particular. The Norteños' principal activities are assault with great bodily injury, murder and robbery. The Red Nose Pittz and the Broderick Boys are both Norteño subsets, and their rivals are the Sureños. The Red Nose Pittz are from Citrus Heights, while the Broderick Boys' territory is West Sacramento. According to Officer Duggins, both defendant and Romero were active members of the Red Nose Pittz.

Officer Duggins said that to get into a gang, it is not enough to associate with gang members; one has to engage in criminal activity that will benefit the gang. The use of force or fear creates respect with gang members. Gang members typically use monikers. A common one is Ryda, which means you are willing to ride along with the gang to party or commit crimes with them. Officer Duggins reviewed various photographs of defendant, Romero and other gang members throwing gang signs and wearing gang colors, and explained how they indicated their gang involvement. Officer Duggins had prior contacts with defendant in which defendant admitted he was a gang member.

Officer Duggins opined that the beating and robbery of Harpst was committed in furtherance of the gang because (1) the gang member and gang gained a material benefit from whatever was taken from the victim and (2) the gang member and gang achieved an increase in status. According to Officer Duggins, the crime increased defendant's status in the gang, and elevated the gang's status in the community via word of mouth. Officer Duggins testified that when he and fellow law enforcement officers were investigating the assault, many people had heard about the crime. Defendant and Romero were well-known gang members and these offenses elevated the gang's status. Ramos, defendant's girlfriend, told Officer Duggins that defendant had participated with other gang members in assaulting and robbing people to gain the gang's respect, and that they would brag about their escapades "to show that they had put in work for the gang."

## DISCUSSION*

### I–III

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 660.

## IV

Defendant contends there is insufficient evidence to support the great bodily injury enhancement because there is no substantial evidence that the victim became comatose due to brain injury, as required by section 12022.7, subdivision (b). We agree.

Section 12022.7, subdivision (b) states: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony *which causes the victim to become comatose due to brain injury* or to suffer paralysis .of a permanent nature shall be punished by an additional and consecutive term of imprisonment in the state prison for five years. As used in this subdivision, 'paralysis' means a major or complete loss of motor function resulting from injury to the nervous system or to a muscular mechanism." (Italics added.)

Under the plain language of the statute, the fact the victim suffered a brain injury is not sufficient to impose the enhancement; the victim must be rendered comatose due to the brain injury. Although it is not necessary for the victim to become comatose permanently (*People v. Galvan* (2008) 168 Cal.App.4th 846, 855 [85 Cal.Rptr.3d 776] ["enhancement applies to comatose victims, whether the state of their coma is permanent or not"; *People v. Tokash* (2000) 79 Cal.App.4th 1373, 1378 [94 Cal.Rptr.2d 814] (*Tokash*) [same]), there must be evidence showing the victim was comatose at some point.[3] The statute does not define the meaning of the. term "comatose." One dictionary defines it as "of, resembling, or affected with coma" (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 246), and a coma is defined as "profound unconsciousness caused by disease, injury, or poison." (*Ibid.*) But in *Tokash, supra,* 79 Cal.App.4th 1373, the appellate court took judicial

---

[3] According to *Tokash, supra,* 79 Cal.App.4th at page 1378, "the evolution of the legislative language after the bill's original introduction, which can offer 'considerable enlightenment as to legislative intent' (*People v. Goodloe* (1995) 37 Cal.App.4th 485, 491 [44 Cal.Rptr.2d 15]), confirms the Legislature did not intend to limit the enhancement to victims in permanent comas. Subdivision (b) of section 12022.7 was added by the enactment of Senate Bill No. 529. (Stats. 1993, ch. 607, § 2, p. 3260.) As originally introduced in the Legislature, the subdivision (b) enhancement applied only if the injury caused the victim to 'become clinically brain dead,' connoting a permanent state. (Sen. Amend. to Sen. Bill No. 529 (1993–1994 Reg. Sess.) May 20, 1993 at <http:// www.leginfo.ca.gov/> [as of Feb. 22, 2000].) During the legislative process, the phrase 'clinically brain dead' was replaced with the word 'comatose.' (Assem. Amend. to Sen. Bill No. 529 (1993–1994 Reg. Sess.) July 15, 1993 at <http://www.leginfo.ca. gov/> [as of Feb. 22, 2000].) The change in terminology from brain dead to comatose demonstrated an intent that the enhancement applied even though the victim's comatose condition was not permanent and irreversible."

notice of medical literature stating that "a Glasgow Coma Scale of eight or less is the accepted definition of the comatose patient." (*Id.* at p. 1377.) Defendant's appellate counsel refers us to similar medical authority that patients with a score between three and eight have a severe disability in brain function resulting in a coma, while a score of nine to 12 reflects a moderate disability with physical or cognitive impairments that may or may not resolve. His request that we take judicial notice of these medical authorities is granted.

■ Here, there is a failure of proof that Harpst was ever comatose. Although Harpst's brother said Harpst was not "conscious" at first, Dr. Shatz expressly stated that Harpst was "conscious" during the time Harpst was in the intensive care unit, and Dr. Shatz declined to say that Harpst was comatose. Shatz chose instead to refer to the Glasgow Coma Scale in assessing Harpst's mental status and said he had a score of nine. Medical authority indicates that a score of eight or less defines a comatose patient. Furthermore, there was no evidence that Harpst's doctors ever put him into an induced coma with paralytics and sedatives. (Cf. *Tokash, supra,* 79 Cal.App.4th at pp. 1377–1378 [a medically necessary, chemically induced coma is sufficient to support a § 12022.7, subd. (b) enhancement].)

There is no question that Harpst was seriously injured, was initially nonresponsive, and suffered a significant brain injury as a result of the assault. But under the express language of the statute more is required; he must have been rendered comatose. There was no substantial evidence introduced at trial demonstrating that Harpst was rendered comatose due to his brain injury. Accordingly, we will strike the great bodily injury (§ 12022.7, subd. (b)) enhancement.

V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The great bodily injury (§ 12022.7, subd. (b)) enhancement is stricken. In all other respects, the judgment is affirmed. The trial court is directed to prepare an amended and corrected abstract of judgment that reflects this modification to the judgment and corrects a typographical error on the abstract by deleting "667" next to count 1, under "SECTION NO." and

---

*See footnote, *ante,* page 660.

replacing it with "664." The trial court shall forward a certified copy of the amended and corrected abstract of judgment to California's Department of Corrections and Rehabilitation.

Raye, P. J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 1, 2013, S209119.