Filed 2/11/16

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063206 |
| v. | (Super.Ct.No. RIF1304571) |
| ERIC CUNNINGHAM, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Bernard Schwartz, Judge. Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Allison V. Hawley, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant,[1] Eric Cunningham, on one count of attempted murder (Pen. Code, §§ 664, 187, count 1) and one count of robbery (§ 211, count 2).[2] The jury found true as to both counts the allegation defendant personally inflicted great bodily injury which caused the victim to become comatose due to brain injury. (§ 12022.7, subd. (b).) Defendant admitted to serving one prior prison term (§ 667.5, subd. (b)) and being convicted of two prior serious violent felonies (§§ 667, subds. (a)(1), (c), & (e)(2)(A); 1170.12, subd. (c)(2)(A)).

The trial court imposed a term of 25 years to life for count 1 and a term of 25 years to life for count 2, to run consecutively to the sentence in count 1. In addition to other enhancements, the trial court imposed a consecutive five-year enhancement in count 1 and a concurrent five-year enhancement in count 2 based on the jury finding that defendant's attack caused the victim to become comatose due to a brain injury. The trial court stayed the enhancement in count 2 pursuant to section 654, subdivision (a).

Defendant appeals, contending the evidence that the victim's treating physicians sedated her to conduct surgery and relieve pain associated with use of a respirator was insufficient evidence to support the jury's finding that the victim was comatose. We affirm.

---

**1** The clerk of the Riverside County Superior Court erroneously indicated in the abstract that defendant was convicted by the court rather than a jury.

**2** Unlabeled statutory citations refer to the Penal Code.

# I

## FACTUAL BACKGROUND

On April 16, 2013, defendant entered a smoke shop, attacked Chaula Patadia, one of the owners, and stole cash and merchandise from the store. A video surveillance camera captured the attack, and the prosecution showed the recording to the jury. The video recording shows defendant removing a mallet from his waistband and using it to hit Patadia in the head twice. Patadia fell to the ground, and defendant took cash from two cash registers. Defendant then hit Patadia a third time, took several items, and left the store.

Patadia was taken to an emergency room, where Dr. Gregory Guldner treated her. Dr. Guldner testified at trial about Patadia's condition and treatment. A CAT scan revealed Patadia had suffered several injuries to her skull and brain. She "had a broken skull bone that had been pushed down and was resting on the brain," a broken zygomatic bone in her cheek, and a broken mastoid bone behind her ear. She also "had bleeding that was between the brain and the skull" and "bleeding inside the . . . meat of the brain as well."

When Patadia returned from the CAT scan, her doctors reassessed her brain function and found "there were periods where she was becoming less awake and more sleepy. And our big concern with brain injury is that if your brain isn't functioning terribly well, you can either slow your breathing, in which case, of course, you don't get enough oxygen, or you don't control the secretions in your mouth, whether that's vomit, which is very common with a head injury, or even just saliva, and they will run down the

3

back of the throat and go down the wrong tube into the lungs and cause pneumonia, which can itself be fatal." Based on these dangers and the fact that Patadia was "seeming to get worse from a neurologic standpoint," Dr. Guldner decided "to place her on life support with a ventilator" and "gave her medications to sedate her, and I placed a tube through her mouth between her vocal cords into her lungs to breathe for her and prevent any of those secretions from getting into her lungs."

The prosecution asked Dr. Guldner, "When you say you sedated her, is that another way of saying an induced coma?" He responded, "Yeah. We don't typically use the term in medicine 'medically induced coma.' That's a layperson's term. But it would be consistent. The medications we use are designed to completely suppress your consciousness so you are unaware of what's happening so that you cannot experience this tube in the back of the throat. It's quite painful when it's there and you're awake and you know it's there. So indeed we induce a complete loss of consciousness through medication."

Patadia then underwent surgery for her injuries. Dr. Guldner testified: "The bleeding that was developing between the skull and the brain, of course, has a risk that as it develops it can push the brain farther away just by pressure. And there's not much space inside the skull. And as that pressure builds up, you can develop problems where you essentially can lose all your nerve function." He testified that "the neurosurgeon . . . lifted up some of the pieces of bone, removed blood that was between the skull and the sac that lines the brain called the dura . . . and then also removed blood between the sac

4

and the brain itself and left a drain in and then tried to get the pieces of bone together again."

On cross examination, defense counsel asked Dr. Guldner, "When you saw [Patadia] before you sedated her, she was conscious?" Dr. Guldner responded, "Yes, sir." On redirect, the prosecution asked him, "In your medical opinion, was it necessary to sedate [Patadia] in order to save her life?" Dr. Guldner responded, "Yes, sir." Dr. Guldner testified that Patadia "was sedated as long as she was on the ventilator, which was 11 days, I believe."

On February 19, 2015, the jury found defendant guilty on one count of attempted murder (§§ 664, 187) and one count of robbery (§ 211). The jury also found true the allegation that defendant inflicted great bodily injury upon Patadia, causing her to become comatose due to brain injury. On March 18, 2015, the trial court sentenced defendant to consecutive 25-year-to-life terms on count 1 and count 2. Based on the finding that defendant had inflicted great bodily injury causing Patadia to become comatose due to brain injury, the trial court sentenced defendant to a five-year enhancement for each count, but stayed the enhancement as to count 2.

## II

## DISCUSSION

Defendant contends the trial record does not contain substantial evidence that defendant caused his victim to become comatose for purposes of section 12022.7. According to defendant, the evidence shows only that his victim "was sedated for surgery and for her comfort." We disagree.

5

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Section 12022.7, subdivision (b) provides that "[a]ny person who personally inflicts great bodily injury on any person . . . which causes the victim to become comatose due to brain injury . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for five years." "Under the plain language of the statute, the fact the victim suffered a brain injury is not sufficient to impose the enhancement; the victim must be rendered comatose due to the brain injury. Although it is not necessary for the victim to become comatose permanently [citations], there must be evidence showing the victim was comatose at some point." (*People v. Delgado* (2013) 213 Cal.App.4th 660, 667 (*Delgado*).) An offense is subject to the enhancement whether the offender caused the comatose state directly or indirectly by beating a victim to such

6

an extent that physicians must induce a comatose state to treat the brain injury. (*People v. Tokash* (2000) 79 Cal.App.4th 1373, 1377-1378 (*Tokash*).)

Since section 12022.7, subdivision (b) does not define "comatose," we understand it to have the meaning it bears in ordinary usage. (See *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 91.) Webster's Ninth New Collegiate Dictionary (1991) at page 262 defines "comatose" as "of, resembling, or affected with coma" or "characterized by lethargic inertness." The same source defines "coma" as "a state of profound unconsciousness caused by disease, injury, or poison." (*Ibid.*) "Unconscious," as used in the phrase "was unconscious for three days," is defined as "having lost consciousness." (*Id.* at pp. 1284-1285.) Thus, a victim is comatose, for purposes of the enhancement, if she is in a state resembling a coma characterized by profound unconsciousness.

In this case there was substantial evidence to support the jury's finding that Patadia was comatose. Dr. Guldner testified a CAT scan revealed several serious injuries to her skull, including a displaced broken bone in her skull that required surgery. He testified he and his colleagues decided to put Patadia on life support with a ventilator because she had declining neurological functioning and there was a risk to her health from lack of oxygen and pneumonia caused by her brain injuries. Dr. Guldner also testified that after she was sedated, Patadia underwent surgery to repair her skull and relieve bleeding in her brain and that she was kept unconscious for 11 days. The prosecution asked Dr. Guldner, "When you say you sedated her, is that another way of saying an induced coma?" He agreed, and explained that while the term "medically

7

induced coma" is "a layperson's term," it is true that the medications he and the other doctors gave Patadia "are designed to completely suppress your consciousness. . . ." This testimony provided a sufficient evidentiary basis for the jury to conclude that Patadia was comatose, in the sense that she was in a profound state of unconsciousness, due to her brain injuries.

Defendant contends the *Tokash* decision is distinguishable because in that case the doctor's testimony "unambiguously established that the victim was in a coma" as well as that the coma was induced by "both sedatives and paralytics." These are distinctions without difference. It does not matter that the physician in *Tokash* testified his patient was "chemically in a coma" whereas Dr. Guldner characterized the phrase "medically induced coma" as a "layperson's term." Dr. Guldner responded in the affirmative when asked whether saying he had sedated Patadia was "another way of saying an induced coma" and he specified that "we induce[d] a complete loss of consciousness through medication." That evidence is sufficient to support the jury's finding and the enhancement. (See *Tokash*, *supra*, 79 Cal.App.4th at pp. 1377-1378 ["the testimony that [the victim] was in a postsurgical coma for two months supports the factual determination that [defendant] inflicted great bodily injury, causing [the victim] to become comatose due to the brain injury"].) Section 12022.7, subdivision (b) does not require that the victim be clinically diagnosed as being in a coma, but only that she be comatose, which is an unconscious state "of, resembling, or affected with coma." Dr. Guldner's testimony that he used medications to induce a complete lack of consciousness is therefore sufficient to warrant the jury's finding that Patadia was comatose. Nor does it matter that

the physician in *Tokash* testified he used sedatives *and* paralytics to induce unconsciousness whereas Dr. Guldner testified that he used "medications to sedate her." Only the comatose state is specified in the statute, and Dr. Guldner's testimony provided the jury with sufficient evidence to find that Patadia was comatose.

Defendant contends we should reach a different result than the court in *Tokash* because here "no reasonable juror could conclude from Dr. Guldner's testimony, when viewed as a whole, that the sedation was necessary to save Ms. Patadia's life." He argues that Dr. Guldner testified "she was sedated to prevent her from experiencing the pain and discomfort associated with having the ventilator tube inserted into her throat . . . ." This argument ignores Dr. Guldner's testimony that Patadia underwent brain surgery in which a neurosurgeon "lifted up some of the pieces of bone, removed blood that was between the skull and the sac that lines the brain . . . and then also removed blood between the sac and the brain itself and left a drain in and then tried to get the pieces of bone together again." It also ignores Dr. Guldner's testimony that Patadia's brain injuries reduced her brain functioning, putting her at risk that she would not "get enough oxygen" or that she would lose "control [of] the secretions in [her] mouth . . . and they will run down the back of the throat and go down the wrong tube into the lungs and cause pneumonia, which can itself be fatal." Finally, it ignores Dr. Guldner's testimony that in his medical opinion it was necessary to sedate Patadia to save her life. The jury could reasonably have concluded from this testimony that Patadia would have died if she had not been sedated to undergo surgery and that her physicians kept her on the ventilator for 11 days after surgery to allow her to recover sufficiently so that she no longer faced the risk of

dying from secondary conditions brought on by reduced brain functioning. We do not disturb such inferences on appeal. (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 462-463 ["In evaluating the evidence, we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence"].) Moreover, on review, we are constrained to consider the record as a whole and resolve any conflicts in evidence in favor of the judgment. (See *People v. Albillar*, *supra*, 51 Cal.4th at pp. 59-60.) We cannot, therefore, displace the jury's finding that Patadia was comatose based on a limited portion of Dr. Guldner's testimony standing alone.

Defendant contends concluding Patadia became comatose merely because she was sedated for surgery would mean "every victim of crime who undergoes surgery will be deemed to have been comatose for purposes of section 12022.7." According to defendant, "the Legislature could not reasonably have intended this result when it enacted section 12022.7, subdivision (b)." This argument ignores the fact that section 12022.7, subdivision (b) applies only to offenders who have inflicted brain injuries and only where the brain injury is so severe that treatment requires placing the victim in a comatose state. It also ignores Dr. Guldner's testimony from which the jury could reasonably have concluded the victim was not sedated merely for surgery, but for *life-saving* surgery and to keep her unconscious for 11 days to enable her brain to recover from the injuries. Thus, our holding does not mean every crime victim who must undergo surgery will be deemed comatose under section 12022.7.

*Delgado*, *supra*, 213 Cal.App.4th 660, cited by appellant, does not compel a different result.  In *Delgado*, the Court of Appeal struck a section 12022.7, subdivision (b) enhancement because there was "a failure of proof that [the victim] was ever comatose."  (*Delgado*, *supra*, at p. 668.)  The treating physician "expressly stated that [the victim] was 'conscious' during the time [he] was in the intensive care unit . . . [and] declined to say that [he] was comatose."  (*Ibid.*)  The physician "chose instead to refer to the Glasgow Coma Scale in assessing [the victim's] mental status and said he had a score of nine," when only "a score of eight or less defines a comatose patient."  (*Ibid.*)  In addition, the Court of Appeal emphasized "there was no evidence that [the victim's] doctors ever put him into an induced coma with paralytics and sedatives."  (*Ibid.*)  None of these evidentiary problems exists in this case.  Dr. Guldner did not refer to the Glasgow Coma Scale at trial and did not resist characterizing Patadia as comatose.  Instead he testified that he "induce[d] a complete loss of consciousness through medication" for the purpose of saving her life, and kept her in her unconscious state for 11 days.  That testimony distinguishes this case from *Delgado* and provided the jury with sufficient evidence to find Patadia was comatose.

11

## III

## DISPOSITION

We affirm the judgment.

CERTIFIED FOR PUBLICATION

RAMIREZ _____

P. J.

We concur:

HOLLENHORST _____

J.

McKINSTER _____

J.