Filed 8/22/22 P. v. Medina CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

JOHN KEVIN MEDINA,

    Defendant and Appellant.

E077202

(Super.Ct.No. INF2000415)

OPINION

APPEAL from the Superior Court of Riverside County. James S. Hawkins, Judge. (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant John Kevin Medina appeals from his conviction of first degree premeditated attempted murder. (Pen. Code, §§ 664, 187, subdivision (a); unlabeled statutory references are to this code.) He argues that the trial court erroneously denied his motion for acquittal after the prosecution presented its case-in-chief, because the prosecution introduced insufficient evidence of premeditation and deliberation. He also challenges the sufficiency of the evidence supporting an enhancement allegation that he caused the victim to become comatose as a result of a brain injury. (§ 12022.7, subd. (b) (§ 12022.7(b)).) We reject both arguments and therefore affirm the judgment.

BACKGROUND

We describe only those facts derived from evidence admitted in the prosecution's case-in-chief because that is the only evidence relevant to the issues in this appeal.

Shortly before 1:00 a.m. on March 14, 2020, a law enforcement officer who was on-duty in Indio, California, heard gunshots. Someone reported hearing multiple gunshots on King Street. (All subsequent date references are to the year 2020.) The officer drove to the scene, where he saw a white minivan that had collided with another car. The driver of the minivan, who was later identified as F. Carranza, was still in the vehicle, injured and not conscious. Carranza had been shot in his left temple. A law enforcement officer who responded to the scene photographed the injury. The photograph was admitted into evidence. Paramedics transported Carranza to the hospital.

The van had one bullet hole in the windshield and five bullet holes in the driver's door. The driver's side window had been shattered by a bullet. Law enforcement found

2

eight nine-millimeter Luger shell casings in the road on King Street in front of the Loza Apartments and north of where the van crashed. The driver's side of the van was on the same side of the street as the Loza Apartments.

Law enforcement found a Motel 6 key card in Carranza's pocket. Carranza had checked into a nearby Motel 6 about 15 minutes before the shooting. He drove a white van and was accompanied by Tammie D., Gilbert M., and an unidentified male.

Tammie lived in an apartment located in the Loza Apartments. The day after the shooting, law enforcement spoke to a witness who was standing with Tammie outside of Tammie's apartment when the shooting happened. The witness heard multiple gunshots followed by a car screeching down the road and then crashing. Immediately after the shooting, the witness saw Medina drive up to the apartment complex in a white car, get out of the car with his girlfriend (whom the witness could not identify by name), go into Tammie's apartment, run out with some bags, and speed off. The witness identified Medina and said that he sold drugs.

On the morning of March 14, Medina and his sister picked up K.B. to take her to work. K.B. and Medina had dated but were no longer together. Medina appeared upset, so K.B. asked him why. Medina told her that he "'fucked up.'" Medina explained that he and Gilbert had gotten into an argument on King Street because Gilbert took his phone. Gilbert told Medina that he did not have the phone and that it was in someone else's car. Medina told K.B. that "the guy with the cell phone went to take off in the car." The prosecutor asked K.B. what Medina told her that "he did to get his phone

3

back," and she responded, "He said he shot the guy." On redirect examination, K.B. clarified that Medina did not tell her "exactly what he did," by which she meant that Medina "didn't tell [her] that he shot anybody in the head."

A detective testified that a smart phone is an important tool to a drug dealer because it allows drug dealers to communicate with clients, to keep records, to track various things, and to make notations.

The day after the shooting, Medina and K.B., who had gotten back together, moved into a bedroom in Marcia J.'s house. Marcia had moved her personal belongings out of the room before Medina and K.B. moved in.

The day after Medina and K.B. moved in, law enforcement searched the bedroom Medina rented at Marcia's house. Law enforcement found mail addressed to Medina in a box in the bedroom along with a single live round of ammunition. They also found a bag with 46 grams of methamphetamine, a digital scale, a Smith & Wesson semiautomatic nine-millimeter Luger pistol, and an empty magazine that fit the firearm. K.B. knew there was a gun in the bedroom and said it was not hers. The gun also did not belong to Marcia, who said that she had never seen it before law enforcement found it.

A criminalist examined and test fired the firearm found in the bedroom and compared the test-fired cartridge casings with the eight shell casings found on King Street. She concluded that the eight shell casings were fired from the firearm found in Medina's bedroom.

4

A law enforcement officer testified that a semiautomatic weapon requires a shooter to squeeze the trigger each time a bullet is fired. A Smith & Wesson nine-millimeter recoils when fired and thus can move a shooter's wrist, forearm, and standing position. Because of the recoil, a shooter aiming at a specific target has to re-aim before each shot. Given the location of the bullet holes in the driver's door and the location of the van and the shooter, the officer opined that "the van was mobile and the shooter was pointing at what he was shooting at as the van moved across him." The shooter was standing close to the middle of the street and within 10 to 15 feet of the driver's door when the shots were fired. The bullets in the driver's door were "grouped fairly close together." From that, the officer deduced that the shooter's marksmanship "was good" and that the shooter "knew what he was shooting at and had a target behind that door." The shooter had to reengage and re-aim at the moving van before each shot.

On March 16, Medina was found driving a car that appeared to be the same white car that a video showed driving away from King Street after the shooting. Law enforcement found a new cell phone in the vehicle.

About nine hours after Carranza was shot, Carranza's brother visited him in the hospital for about 10 minutes. Carranza's eyes were closed, and he was unconscious and sedated. Carranza did not respond to his brother during the visit. The prosecutor asked Carranza's brother if he knew "when [Carranza] regained consciousness," and Carranza's brother answered, "Approximately three weeks after the accident, we did get a phone call, and they told us to gather the family." Responding to further questioning,

5

Carranza's brother also confirmed that he "became aware" that Carranza regained consciousness about three weeks after the accident. Carranza remained in the hospital for at least three weeks.

After Carranza was released from the hospital, Carranza's brother helped care for Carranza by taking him shopping, to doctor's appointments, and to visit his children. Before being shot, Carranza did not need any assistance with those tasks. Carranza previously worked as an independent contractor for his brother's security installation company. Carranza was not able to return to work after the shooting. After being released from the hospital, Carranza had issues with his memory, often repeated himself, talked to himself, and suffered from delusions. In addition to suffering from other physical injuries, Carranza had an indentation on his left temple in front of his ear.

Medina testified on his own behalf and denied shooting Carranza. Medina claimed that Gilbert shot Carranza and sold Medina the gun the next day. One of the law enforcement officers who interviewed Medina after he was arrested and who was present for K.B.'s interview testified for the prosecution in rebuttal.

DISCUSSION

A. *Standard of Review*

In reviewing a sufficiency of the evidence claim, we review the "record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt. [Citation.] We draw all reasonable

6

inferences in favor of the judgment." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11 (*Cardenas*).)

B. *Premeditation and Deliberation*

At the close of the prosecution's case-in-chief, Medina moved under section 1118.1 to dismiss the allegation that the attempted murder was committed with premeditation and deliberation. The trial court denied the motion. Medina argues that the trial court erred because the prosecution had not produced sufficient evidence of premeditation and deliberation. The argument lacks merit.

"Section 1118.1 requires the trial court in a jury trial on its own motion or the motion of the defense to acquit the defendant if at the close of the case of either party the evidence is insufficient to sustain conviction on appeal. When reviewing the denial of a motion to acquit for insufficient evidence made at the close of the prosecution's case, we consider only the evidence then in the record." (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1464, fn. omitted.)

An attempted murder is deliberate and premeditated "if it occurs ""'as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'""" (*Cardenas*, *supra*, 53 Cal.App.5th at p. 121; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).) """The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the

7

extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .""" (*People v. Cage* (2015) 62 Cal.4th 256, 276.) We ordinarily consider "'three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.""" (*Cardenas*, at p. 121; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Those guidelines—referred to as the *Anderson* factors—"are descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Medina argues that the prosecutor's evidence in its case-in-chief shows "the hasty discharge of a firearm in response to an argument with [Gilbert]—and an absence of planning activity—reflecting the *absence* of premeditation and deliberation." He argues that there was no evidence that he planned to kill Carranza, because there was no evidence that he and Carranza were acquainted or that he harbored any animosity toward Carranza personally or as part of a gang-related rivalry. We reject those arguments. The prosecution presented ample evidence that Medina premeditated and deliberated before shooting Carranza, including evidence of planning activity, motive, and manner of killing.

First, despite the fact that there was no evidence that Medina and Carranza knew each other or that there was any animosity between them before the shooting, there was

8

evidence of planning activity. According to what Medina told K.B., Gilbert told Medina that Medina's stolen phone was in Carranza's car. Medina said that "[h]e shot the guy" to get his phone back. A factfinder could reasonably infer from that evidence that Medina planned to kill Carranza once he learned that Carranza possessed his stolen phone and saw Carranza attempt to leave with the phone. A reasonable factfinder could infer that in the moments between learning that his cell phone was in Carranza's car and seeing Carranza start to drive away, Medina reflected and formed the plan to kill Carranza. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348 ["The test is not time, but reflection"].) Contrary to Medina's argument, that inference is further supported by the lack of evidence that Medina knew Carranza. A reasonable factfinder could infer that Medina reasoned that he had to kill Carranza to get his phone back because he did not have any way of contacting or otherwise finding Carranza, who was a stranger to him.

Second, there was ample evidence of motive. Medina believed that Carranza was driving off with his cell phone. There was evidence that Medina sold drugs and that cell phones are particularly important to drug dealers. From that evidence, a reasonable factfinder could infer that Medina wanted to kill Carranza as revenge for possessing Medina's stolen phone or as a means of retrieving his stolen phone from Carranza.

Third, the manner of killing also supports the trial court's conclusion that the prosecution presented sufficient evidence of premeditation and deliberation in its case-in-chief. Medina fired at Carranza's fleeing van eight times. Medina was no more than 20 feet away from Carranza when he fired those shots. After each shot, Medina had to re-

aim because of the firearm's recoil and because the van was a moving target. Yet, despite those difficulties, Medina managed to hit the driver's door, the windshield, and Carranza's head. The prosecution's expert testified that the placement of the bullets demonstrated that the shooter was a good marksman who was aiming to hit a target behind the driver's door, namely, Carranza. From that evidence, a reasonable factfinder could infer that Medina shot at Carranza numerous times as a result of deliberation. (*People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 ["quickly fir[ing] three shots at the victim, with a shotgun, from a relatively close range" supported finding of premeditation and deliberation]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1002 [aiming deliberately at people the defendant had a motive to kill supports finding of premeditation and deliberation].) Moreover, a reasonable factfinder could infer from the shot to Carranza's head that Medina intended to shoot Carranza in the head and thus harbored a deliberate intent to kill. (*Koontz, supra*, 27 Cal.4th at p. 1082 ["firing a shot at a vital area of the body at close range" "indicative of a deliberate intent to kill"].)

Relying on *People v. Caldwell* (1955) 43 Cal.2d 864 and *People v. Tubby* (1949) 34 Cal.2d 72, Medina argues that "infliction of multiple acts of violence on the victim is alone insufficient to support a finding . . . of premeditation and deliberation." We reject the argument because, as we have explained, the trial court's conclusion that the prosecution presented sufficient evidence of premeditation and deliberation was supported by evidence of Medina's motive, planning activity, and the manner of killing, not merely the number of gunshots fired.

In sum, we conclude that the prosecution presented sufficient evidence of premeditation and deliberation in its case-in-chief. The trial court therefore did not err by denying Medina's motion for acquittal.

C. *Great Bodily Injury Enhancement*

The jury found true the allegation that Medina inflicted great bodily injury on Carranza by causing him to become comatose due to brain injury. (§ 12022.7(b).) Medina argues that there is insufficient evidence to support the enhancement because there is no evidence that Medina was comatose, suffered permanent paralysis, or was comatose as a result of a brain injury. We are not persuaded.

Section 12022.7(b) provides that "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be" subjected to an additional specified prison term. For purposes of the enhancement, a victim is comatose if they are "in a state resembling a coma characterized by profound unconsciousness" (*People v Cunningham* (2016) 244 Cal.App.4th 1049, 1054 (*Cunningham*)), even if the victim is not "clinically diagnosed as being in a coma" (*id.* at p. 1055). The victim does not need "'to become comatose permanently.'" (*Id.* at p. 1053; see *id.* at pp. 1053-1054; *People v. Delgado* (2013) 213 Cal.App.4th 660, 667.) "An offense is subject to the enhancement whether the offender caused the comatose state directly or indirectly by beating a victim to such an extent that physicians must induce a comatose state to treat the brain injury."

11

(*Cunningham*, *supra*, at p. 1054; *People v. Tokash* (2000) 79 Cal.App.4th 1373, 1377-1378.)

First, we agree with Medina that there is no evidence that Carranza suffered permanent paralysis. But that is not at issue, because the prosecutor did not proceed under that theory. Rather, the prosecutor argued that Medina had to have "personally inflicted great bodily injury causing [Carranza] to become comatose" "due to brain injury."

Second, we reject Medina's argument that "evidence that Carranza was 'unconscious' and 'unresponsive' does not show he was comatose."[1] Medina cites no legal authority supporting that argument, and this court has held to the contrary. In *Cunningham*, we rejected the defendant's argument that there was not evidence to support the section 12022.7(b) enhancement because the evidence showed only that the victim "'was sedated for surgery and for her comfort.'" (*Cunningham*, *supra*, 244 Cal.App.4th at p. 1053.) We determined that because the statute does not define the term "comatose" (§ 12022.7(b)), it has "the meaning it bears in ordinary usage." (*Cunningham*, at p. 1054; *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d

---

[1] In the reply brief, Medina argues for the first time that the prosecution was required to prove that Medina was comatose via expert evidence because whether a person is in a comatose state involves a medical diagnosis. In general, we consider an argument made for the first time in a reply brief forfeited absent a showing of good cause. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.) "Withholding a point until the reply brief deprives the respondent of an opportunity to answer it . . . ." (*Ibid.*) Because Medina has not demonstrated good cause for his failure to raise his new argument earlier, we consider the argument forfeited. Moreover, Medina does not develop this argument or cite any authority supporting it.

84, 91 ["words in a statute must be given the meaning they bear in ordinary usage"].) We then looked to the dictionary definition of the words "comatose," "coma," and "unconscious" and concluded that "a victim is comatose, for purposes of the enhancement, if she is in a state resembling a coma characterized by profound unconsciousness." (*Cunningham*, at p. 1054.)

Medina's attempts to distinguish *Cunningham*, *supra*, 244 Cal.App.4th 1049 on the basis of its facts are unavailing. Our analysis of the statutory language did not depend upon the particular facts presented. We determined the meaning of the statutory term "comatose" by applying general principles of statutory interpretation, and we apply the same interpretation here.

The record contains substantial evidence to support the jury's finding that Carranza was comatose for purposes of the section 12022.7(b) enhancement. The law enforcement officer who found Carranza in his van after the shooting testified that Carranza was unconscious. About nine hours later, Carranza's brother visited Carranza in the hospital and found him to be unconscious and nonresponsive during the entire 10-minute visit. The prosecutor asked Carranza's brother if he knew when Carranza "regained consciousness," and Carranza's brother answered, "Approximately three weeks after the accident . . . ." A jury could reasonably infer from all of those facts that Carranza was "in a state resembling a coma characterized by profound unconsciousness" (*Cunningham*, *supra*, 244 Cal.App.4th at p. 1054) and thus was comatose as defined in section 12022.7(b).

13

Medina argues that the evidence does not show that Carranza was unconscious for three weeks, because Carranza's brother's testimony was purportedly "ambiguous" on that point. It is true that Carranza's brother's acknowledgement that he "became aware that [Carranza] regained consciousness" three weeks after the shooting indicates when Carranza's brother learned that Carranza had regained consciousness but does not necessarily show when Carranza regained consciousness. However, when the prosecutor asked Carranza's brother if he knew "when [Carranza] regained consciousness," as opposed to when he learned of that occurrence, Carranza's brother answered, "Approximately three weeks after the accident . . . ." That testimony supports an inference that Carranza was unconscious for three weeks. We draw all reasonable inferences in support of the judgment. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119, fn. 11.)

Moreover, there is also substantial evidence that Carranza was comatose due to a brain injury. Carranza was shot in the head. After regaining consciousness and being released from the hospital, he showed various symptoms of impaired mental functioning, including losing his memory, experiencing delusions, talking to himself, and repeating himself. A reasonable jury could infer that those issues were the result of a brain injury. And given that Carranza lost consciousness immediately after being shot, a reasonable jury also could infer that his comatose state resulted from that injury.

For all of these reasons, we conclude that substantial evidence supported the jury's true finding under section 12022.7(b).

14

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

SLOUGH
J.