Filed 6/13/23  P. v. Tate CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL CURTIS TATE,<br><br>    Defendant and Appellant. | D080381<br><br><br>(Super. Ct. No. BAF1900516 ) |

APPEAL from a judgment of the Superior Court of Riverside County, Joshua Andrew Knight, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Daniel Curtis Tate of corporal injury upon a spouse resulting in a traumatic condition (Pen. Code,[1] § 273.5, subd. (f)(1); count 1); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2); willfully resisting or obstructing an officer from performing his duties (§ 148, subd. (a)(1); count 3); and violating a protective order after a conviction involving domestic violence (§ 166, subd. (c)(1); count 4). As to count 1, the jury found true that Tate was previously convicted under section 273.5, subdivision (f)(1). Regarding counts 1 and 2, the jury also found true that Tate personally inflicted great bodily injury (§ 12022.7, subd. (e)). In addition, Tate stipulated that he was previously convicted of willful infliction of corporal injury (§ 273.5, subd. (f)(1)). However, the jury found Tate not guilty of sexual penetration by means of force, violence, or fear (§ 289, subd. (a)(1)(A); count 5).

The court sentenced Tate to prison for nine years, consisting of the upper term of four years on count 2 plus five years for the great bodily injury enhancement. Pursuant to section 654, the court stayed the sentence under count 1.

Tate appeals, contending substantial evidence does not support the jury's true finding of the great bodily injury enhancement and the trial court erred in imposing the upper term under count 2. We affirm.

FACTUAL BACKGROUND

*Counts 1-5*

Jane Doe met Tate in 2014, and they married in November 2018. They had no children together, but Doe had children of her own. Doe and Tate were homeless at various times in their relationship. At other times, they stayed with Tate's grandmother or rented his uncle's trailer.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

Around April 29, 2019, Doe was in the kitchen cooking dinner when Tate came home from work. He came into the kitchen and ordered Doe to undress. She refused, so he undressed her himself. Doe did not try to stop Tate because she did not want to suffer the likely consequences, which she believed would include physical and mental abuse. After she was naked, Tate told her to get down on her hands and knees, crawl over to him, and put her head on his shoes. Doe complied, and Tate bent down and digitally penetrated her vagina. She could feel his nails cutting her. She told him to stop and tried to crawl forward. Tate became angry and assaulted her harder. When she was able to get up, she placed her hand near her vagina and the hand was "filled with blood." Doe did not call the police because she did not want Tate to go to jail.

On May 6, 2019, Doe and Tate were housesitting for her coworker. She was cooking dinner and talking with her daughter, S.K., on the phone when Tate returned home from work. Doe and Tate drank alcohol that night. As Doe and Tate were talking, he became angry, and the couple argued. S.K. asked to speak with Tate and while they were on the phone, Tate began arguing with S.K. The call ended, but Tate remained upset. His eyes bulged, and Doe placed her index figure and moved it horizontally in a straight line from Tate's left eye to his right eye to try to "calm his eyes down."

Nonetheless, Tate became more upset, "cocked back his arm" and hit Doe in the face, bloodying her nose. After Tate hit Doe, she spoke with S.K. again and told S.K that Tate had hit her. S.K. called the police.

Tate had hit and strangled Doe previously, and she was afraid of him. However, she did not call the police and could not explain why she refrained from doing so.

3

At some point after being struck in the nose, Tate grabbed Doe by the neck and began strangling her. He also ripped a necklace off her neck. While he strangled her, he called her a "stupid white woman," which was something he frequently said to her.

Two sheriff's deputies approached the house. Deputy Sheriff Travis Miller looked through a window and saw Doe and Tate. Doe "appeared to be upset and crying. [Tate] appeared to be flustered or angry." The deputies knocked on the door and announced themselves. Doe opened the door and said, "Hello." Miller noticed the left side of Doe's face was "sagging a little bit." He brought Tate outside to speak with him and sheriff deputy Michael Eaton went inside the house with Doe.

Initially, Doe could speak clearly and her speech was not slurred. During her interaction with the deputies, however, Doe's speech quickly became slurred, and she became unintelligible. Initially, the deputies assumed she was intoxicated. Doe began swaying side-to-side and appeared to have difficulty standing and walking. Eaton asked her to sit down and noticed the left side of her face was drooping. As he proceeded to the back room to determine whether anyone else was in the home, he and Miller heard a loud thud from the kitchen where Doe had been sitting. When he came out, he found Doe lying on the floor partially beneath a table.

Miller went inside immediately after hearing Doe hit the ground. She was mumbling and speaking gibberish. Doe was unable to move half of her body and could not get up. Miller noticed dried blood on her nose and redness around her throat. When he asked if Tate struck her, she nodded her head and "motioned her first punching her face." She also brought her hand to her throat and nodded yes when Miller asked if Tate had choked her. She had a "very large bruise" on her forehead. The deputies called for an ambulance.

Paramedics responded and examined Doe. Doe did not recall collapsing to the ground, although she remembered being wheeled out to an ambulance. Doe does not have heart problems, but she heard Tate tell someone that she did as she was being wheeled out on a stretcher. However, Doe was taking blood pressure medication at the time.

The deputies took Tate into custody by placing his hands behind his back and handcuffing them. As Tate and Miller walked to the patrol car, Tate asked whether he was being arrested for domestic violence. Miller responded in the affirmative, and Tate stopped talking. After they reached the patrol car, Miller went to unlock the back door, and Tate broke away from the deputy's grip and ran off. Miller slipped and hit the ground, tried to get back up and slipped again, injuring his knee. He then chased after Tate. Miller lost sight of Tate around a corner.

On May 7, an investigator with the sheriff's department attempted to speak with Doe at the hospital. When the investigator arrived, he saw several wires and IVs in her arm and she wore a neck brace. She was ill and vomiting, and he was unable to speak with her.

On May 9, 2019, the investigator located Tate in a city about 30-45 minutes away from the house where the incidents occurred. Tate was arrested again.

At the time of trial, Laura Macias was an assistant nurse manager. When she originally examined Doe, she was a registered nurse and a forensic nurse. A forensic nurse is a registered nurse with the additional training to collect evidence. Specialized training and experience in critical care is required to become a forensic nurse. Macias attended strangulation training, which was designed to train forensic nurses regarding the signs and symptoms of non-fatal strangulation. During her three years working as a

5

forensic nurse, she conducted between 15 and 20 strangulation assessment exams. Macias also was a forensic nurse in the Sexual Assault and Forensic Examiners department at the time she examined Doe. Macias had experience working with stroke patients and is able to identify the signs and symptoms of a stroke. Common signs of a stroke are slurred speech, facial droop, and weakness to one side of the body.

In the early morning hours of May 7, 2019, the emergency room called Macias's department for a forensic nurse because they were concerned that Doe had been a victim of violence. When Macias responded, she found Doe lying on a gurney, wearing a cervical collar, and with the lights off in her exam area. She asked Doe her name and Macias noticed she had slurred speech. The light hurt Doe's eyes and she did not want to open them. Macias noticed the left side of Doe's face was droopy and she had a bruise on the left side of her forehead.

Macias began to go through her forensic checklist of signs and symptoms. Macias asked Doe questions during the head-to-toe assessment, and she was able to respond with complete answers. Doe reported that Tate punched her but denied that he sexually assaulted her. When Macias asked Doe about strangulation, she reported that Tate put both of his hands around her neck and "choked her."

Macias completed a full strangulation assessment, which included taking a DNA swab of Doe's neck using long Q-Tips that fit through the opening of the cervical collar. Doe said it hurt when Macias touched her neck with the cotton swabs, which is consistent with someone who had pressure applied to their neck. Doe reported difficulty breathing, nausea, dizziness, headache, disorientation, memory loss, difficulty swallowing, sore throat,

6

pain while speaking, and feeling faint. The symptoms Doe presented were consistent with strangulation.

Macias opined that strangulation could lead to a stroke. She testified that trauma is an injury and trauma from strangulation is not always visible. It can be a soft tissue injury, which can lead to swelling that can compromise the airway or it can lead to injury of the blood vessels. The tenderness in Doe's neck was a sign and symptom of trauma. Macias explained that when a person is strangled, pressure is applied to the arteries, which impedes blood flow through the arteries to the brain. If blood flow is blocked, blood clots can form and when the pressure is removed, the flow of blood can carry that clot to the brain.

Doe suffered a stroke and remained in the hospital for about one month. As a result of the stroke, she is paralyzed on the left side of her body and is confined to a wheelchair. After the stroke, Doe occasionally has difficulty remembering certain things. Doe never previously suffered a stroke.

Doe was admitted to the hospital as a trauma patient. The division chief of neurology, Ruby Koshy, who evaluated Doe after she was admitted, described two different types of strokes. With a hemorrhagic stroke, the brain bleeds. With ischemic strokes, a blood clot forms in the blood vessels and blocks the blood supply to a part of the brain. Specifically, the brain has an anterior circulation and a posterior circulation. The carotid arteries on each side of the neck supply blood to the main feeder vessels that branch out and supply blood to the brain.

The posterior circulation is comprised of two smaller vessels in the back of the neck that provide blood to the back part of the brain and the brain

7

stem. High blood pressure is a risk factor for strokes, but it is most often associated with hemorrhagic strokes.

Doe suffered an ischemic stroke. Koshy reviewed her CT scans and determined that the cause of Doe's stroke was a dissection, or tear, in the right internal carotid artery. The tear caused bleeding, which likely formed a blood clot that broke off and traveled through the blood vessels. Doe subsequently had a stroke on the left side of her brain because the blood clot traveled up to her brain on the right side. The doctors determined that she should be transferred to a hospital that could provide a higher level of care so that the clot could be removed from her brain.

Koshy testified that it is not easy to tear a carotid artery. Carotid dissections usually occur due to a trauma, including blunt trauma such as violence or strangulation. A dissection can occur due to a genetic disorder called fibromuscular dysplasia, but this is uncommon. Tears do not occur from being punched in the face, and it is unlikely that a carotid artery could tear from whiplash or from a fall unless the person fell in an awkward position or is older with "very pliable vessels." Falling directly on one's head would not cause a tear. High blood pressure, alcoholism, and smoking are risk factors for strokes, but none can cause a tear of an artery. Koshy testified it is possible for a person to grab another person's neck forcefully enough to cause a tear of the carotid artery, but she could not say whether that happened to Doe. However, the symptoms of a stroke are "very acute" and the stroke would have occurred shortly after the tear of the carotid artery.

Koshy reviewed video from the deputy's body worn camera when he responded to Doe's house. She noted that Doe was initially walking and talking before she sat down. After she sat down, but before she fell out of the

8

chair, the left side of her face started to droop and she became unable to speak. Koshy explained that these are signs of someone suffering from a stroke. When Doe fell out of the chair, she fell to the left, her weak side, which was consistent with someone suffering from a stroke. Koshy believed that the stroke was evolving from the time Doe opened the front door to the time she fell out of the chair and could not lift herself up.

Prior Acts Evidence

In October 2017, Doe and Tate were homeless and lived behind a Kmart. On or around the evening of October 3, 2017, Tate strangled Doe and banged her head while she was lying down on the ground in a sleeping bag. He also punched Doe repeatedly in the face. She lost consciousness several times during the assault.

At some point, a girl riding her bicycle nearby distracted Tate and Doe was able to get up and run away. A no negative contact order was filed against Tate on October 31, 2017 and named Doe as the protected party.

DISCUSSION

I

GREAT BODILY INJURY ENHANCEMENT

A. Tate's Contentions

Tate contends substantial evidence does not support the jury's true finding that he personally inflicted great bodily injury on Doe in the commission of the assault. We disagree.

B. Standard of Review

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "[W]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of

9

fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence— that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

C. Infliction of Great Bodily Injury

Section 12022.7, subdivision (e) defines the great bodily injury enhancement that the jury found true in this case: "Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for

10

three, four, or five years.  As used in this subdivision, 'domestic violence' has the meaning provided in subdivision (b) of Section 13700."[2]

The phrase "great bodily injury" as used in section 12022.7 is defined as " 'bodily injury which is significant or substantial, not insignificant, trivial or moderate.'  [Citation.]  '[T]he injury need not be so grave as to cause the victim " 'permanent,' 'prolonged,' or 'protracted' " bodily damage.  [Citation.]' " (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.)

### D.  Analysis

Here, the great bodily injury the prosecution sought to prove at trial was the tear to Doe's carotid artery, caused by Tate's strangulation of her. Tate contends the evidence the prosecution offered at trial only showed there was a correlation between Doe's strangulation and the tear of the carotid artery (leading to the stroke).  To this end, he argues the prosecution merely proved that the tear to the carotid artery occurred close in time to the act of strangulation, but there was no evidence offered that the act of strangulation caused the tear.  In other words, Tate maintains the evidence points to a coincidence and falls short of establishing causation.  We disagree.

---

2      Section 13700, subdivision (b) provides:  " 'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.  For purposes of this subdivision, 'cohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship.  Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold themselves out as spouses, (5) the continuity of the relationship, and (6) the length of the relationship."

The evidence established that Tate strangled Doe just before she had the stroke. After Tate punched Doe in the face during an argument, her daughter called the police. Tate then strangled Doe. When deputies arrived shortly thereafter, Doe initially could move and talk coherently. However, she quickly began exhibiting signs of a stroke. The left side of her face became droopy, her speech became slurred, and she was unable to speak. After Eaton asked her to sit down, she fell off the chair to the left side, which was the side of her brain in which she had the stroke. Doe was able to communicate to deputies through hand gestures that Tate had strangled her. Koshy testified that strokes are characterized by a sudden onset of symptoms. A reasonable jury could conclude from the forgoing that the precipitating cause of the stroke occurred immediately before the deputies arrived.

Additionally, the evidence established that strangulation could cause a carotid tear. Koshy testified that ischemic strokes, the kind that Doe suffered, are caused by the formation of blood clots that block the blood supply to part of the brain. Doe suffered from a tear in the carotid artery, which caused bleeding that likely formed a blood clot. Koshy testified that carotid tears are most often caused by a trauma and that strangulation can cause trauma. Additionally, Macias opined that strangulation could lead to a stroke as a result of pressure applied to the neck and the arteries and that the symptoms Doe exhibited were consistent with strangulation.

Against this background, we determine a reasonable jury could conclude that Tate's act of strangling Doe caused her carotid artery to tear. Tate strangled Doe shortly before she began exhibiting the symptoms of the stroke. The immediacy of Tate's strangulation to the onset of the stroke

12

symptoms was strong circumstantial evidence that it was the act of strangulation that caused the carotid artery to tear.

Nonetheless, Tate argues that although the tear occurred close in time to the strangulation, there was no evidence offered that the act of strangulation was the actual cause. We reject this contention. The evidence showed that Tate applied such strong pressure to Doe's neck that her neck was red when deputies responded, and when she was examined at the hospital her neck still hurt, her throat was sore, and she had difficulty swallowing and breathing.

Further, our conclusion does not change if we consider *People v. Delgado* (2013) 213 Cal.App.4th 660 (*Delgado*) as Tate urges. In that case, the appellate court determined that a serious permanent brain injury did not support the great bodily injury enhancement pursuant to section 12022.7, subdivision (b) because there was not substantial evidence that the victim was ever comatose. (*Delgado*, at p. 667.) The court's finding was based on subdivision (b) of section 12022.7, which states: "[a]ny person who personally inflicts great bodily injury . . . in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury . . . shall be punished." (§ 12022.7, subd. (b).) The court concluded "[u]nder the plain language of the statute, the fact the victim suffered a brain injury is not sufficient to impose the enhancement; the victim must be rendered comatose due to the brain injury." (*Delgado*, at p. 667.) Although the victim was seriously injured and suffered a significant brain injury as a result of an assault, there was a failure of proof that the victim was ever comatose. (*Id.* at p. 668.)

*Delgado* is not instructive here. Tate was charged under subdivision (e) of section 120227, not subdivision (b). Moreover, the plain language of

section 12022.7, subdivision (e), is satisfied here. Tate personally inflicted great bodily injury on Doe during the commission of the assault and while inflicting corporal injury upon a spouse by strangling her and causing a tear to her carotid artery. Additionally, in *Delgado*, the treating physician "expressly stated that [the victim] was 'conscious' during the time [he] was in the intensive care unit . . . [and] declined to say that [he] was comatose." (*Delgado*, *supra*, 213 Cal.App.4th at p. 668.) There is no analogous evidence in the record here. Koshy did not testify that Doe did not suffer from great bodily injury or rule out strangulation as a possible cause of a tear of the carotid artery. To the contrary, she testified that strangulation could result in a tear to the carotid artery and that any stroke is "serious." Koshy's testimony was much different than that of the physician in *Delgado*.

In short, viewing the entire record in the light most favorable to the judgment, the jury reasonably could have concluded that Tate's strangulation of Doe caused the tear in her carotid artery. As such, we conclude that substantial evidence supports the jury's true finding of the great bodily injury enhancement.

## II
## SENTENCING
### A. Tate's Contentions

Tate contends that the trial court erred in imposing the upper term sentence on count 2 because the sentence was not supported by stipulated facts or based on the jury's findings beyond a reasonable doubt. He thus argues that the matter must be remanded for resentencing. We disagree.

### B. Background

At the sentencing hearing, the prosecution noted, and the court acknowledged, the new changes in the law, "especially in sentencing, [there

14

is a] new landscape now." The prosecution requested that the court select count 1 as the principal term and choose the midterm of four years. The prosecution also requested the midterm for the enhancement for great bodily injury for a total sentence of eight years.

After pointing out that the factors in aggravation noted by the prosecution had not been "proved beyond a reasonable doubt to a jury or admitted by Mr. Tate," defense counsel requested that the court make count 2 the principal term and impose the middle term of three years.

The court elected to stay the sentence for Tate on count 1 and the corresponding enhancement under section 654. Further, the court determined, "[t]o avoid dual use issues, the Court is selecting to sentence on Count 2, as the Court is going to rely on Mr. Tate's prior and record to impose the upper term on Count 2 and the enhancement." The court continued:

> "Going through the circumstances in aggravation, as [California Rules of Court, rule] 4.421(a)(1) states, deals with whether the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. I don't find that Mr. Tate used great violence, threats of great bodily harm, or other acts disclosing a high degree of cruelty, callousness, or viciousness upon [Doe] when he choked her. But I do find that he inflicted great bodily injury, as the jury did. I don't think he intended to hurt [Doe] as he did, but the fact is he did.
>
> "[Doe] had medical conditions that made her unusually susceptible to harm. And that does not excuse the pain and suffering caused to her. I am, however, prohibited from using the fact of the proof of the great bodily injury enhancement as a factor in aggravation.
>
> "So going to the factors in mitigation, as laid out by the defense, I do not find that [Doe] was an initiator or provoker of the incident. While it appears that there was an argument between Mr. Tate and [Doe], the jury was

15

given the self-defense instruction, and they rejected that defense.

"I also do not find that the circumstances were unusual and likely to reoccur based on Mr. Tate's history, which leads me to the only circumstance in mitigation that the Court did find, but it also could be a circumstance in aggravation. So the Court is discounting both [California Rules of Court, rules] 4.421(b)(4) and 4.423(b)(6), which deals with whether Mr. Tate has satisfactorily completed probation, mandatory supervision, or parole. It should be noted that Mr. Tate successfully completed his probation in [case No.] INM1303670, completing domestic violence classes and community service. He was also successful in [case No.] INM1305144. And even his mandatory supervision expired when it was transferred from his San Bernardino County case.

"The problem that I have is that his successes before were—his successes on probation were before his conduct that is increasingly more serious. Despite completing domestic violence classes in January 2015, he committed three more domestic violence offenses in the four years that followed, including the escalating offenses committed against [Doe].

"Mr. Tate was on the right track for three years in this past decade, but he has sharply regressed and poses a danger to all the women he dates. And he has committed domestic violence against three different women, and one was suspected his own children. For that reason, the Court is not finding that as an aggravant or mitigant.

"But I do find—and this is understanding that the People and the parties believe that the factors in aggravation have not been proven, but they were admitted by Mr. Tate. Specifically, the defendant's prior conviction as an adult or sustained petitions in juvenile delinquency proceedings are numerous and increasing seriousness. Specifically, Mr. Tate has admitted a prior domestic violence incident as to [Doe]. That was committed in 2017, and he was released from state prison on November 13th of 2018.

16

"And within six months, committed another felony violation of [section] 273.5, causing lasting damage, physical harm to [Doe] that she lives with to this day. And she has succinctly told the Court.

"There is another factor that appears to be proven by this; however, the Court is not relying on it. The defendant has engaged in violent conduct that indicates a serious danger to society. I would find that; however, there is a concern that this was not proven to the jury.

"Also, I do find that [California Rules of Court, rule] 4.421(b)(3) applies because Mr. Tate did admit that he has served his prior and he has served prior prison terms.

"In light of the fact that there are no circumstances in mitigation and circumstances in aggravation, the Court selects the upper term on Count 2, due to the increasing seriousness as shown by Mr. Tate's admission of his prior and the current offense. For the same reason—so that I would impose on Count 2 the upper term of four years. And for those same reasons, the Court would impose the upper term on Count 2, Count 2's enhancement for five years for a total term of nine years on Count 2."

## C. Analysis

Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567), which became effective on January 1, 2022, amended sections 1170 and 1170.1 to limit the trial court's discretion to impose the upper term. Specifically, it limited the trial court's ability to impose a sentence greater than the middle term unless the aggravating factors justify doing so and the facts underlying the circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt. (§ 1170, subd. (b)(1), (2), as amended by Stats. 2020, ch. 29, § 15; see *People v. Lopez* (2022) 78 Cal.App.5th 459, 464.) Notwithstanding this limitation, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of

17

conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) The bill further provides that the trial court "shall set forth on the record the facts and reasons for choosing the sentence imposed." (§ 1170, subd. (b)(5).)

Tate contends that in sentencing him to the upper term in count 2, the trial court impermissibly relied on his criminal record in addition to the prior conviction found by the jury, that he had inflicted great bodily injury as determined by the jury, that his conduct was increasingly more serious, and that Tate committed domestic violence against three different women. Tate's argument is not supported by the record.

In imposing the upper term on count 2, the court relied solely upon Tate's prior term in prison (Cal. Rules of Court, rule 4.421(b)(3)) and the fact that his "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." (Cal. Rules of Court, rule 4.421(b)(2).)

As to California Rules of Court, rule 4.421(b)(3), the parties stipulated that Tate was previously convicted of willful infliction of corporal injury on October 31, 2017. The court thus properly found that "Mr. Tate did admit that he has served his prior and he has served prior prison terms."

Regarding California Rules of Court, rule 4.421(b)(2), Tate was convicted by jury in the instant case of, among other crimes, corporal injury upon a spouse resulting in a traumatic condition and assault by means of force likely to produce great bodily injury. The court specified that its finding was based on the fact that Tate "admitted a prior domestic violence incident as to [Doe]. That was committed in 2017, and he was released from state prison on November 13th of 2018. And within six months, committed another felony violation of [section] 273.5, causing lasting damage, physical

18

harm to [Doe] that she lives with to this day." Thus, the court made clear that it selected the upper term on count 2 and the corresponding enhancement due to the increasing seriousness of Tate's convictions as demonstrated by his admission of his prior domestic violence conviction and the current offense.

Tate argues the court improperly relied on the fact that he had inflicted great bodily injury as determined by the jury. The court did nothing of the kind. Reviewing California Rules of Court, rule 4.421(a)(1), whether the crime involved great violence, great bodily harm, or a high degree of cruelty or viciousness, the court found, as the jury found, that Tate did inflict great bodily injury. Nevertheless, the court specified, "I am, however, prohibited from using the fact of the proof of the great bodily injury enhancement as a factor in aggravation."

Tate also contends the court improperly relied upon his acts of domestic violence against three different women. Again, Tate is mistaken. Although the court did note that Tate "committed three more domestic violence offenses," that comment was in the context of considering his prior performance on probation, mandatory supervision, or parole. (Cal. Rules of Court, rule 4.421(b)(5)). The court simply noted that his success on probation was before his acts of domestic violence and that Tate had been "on the right track for three years" but that he had regressed. The court concluded its comments on Tate's prior performance on probation by stating it was "not finding that as an aggravant or mitigant."

Finally, Tate contends the court improperly relied on his prior criminal record beyond the prior conviction he admitted when it said it was "relying on [his] prior and record to impose the upper term." That the court said "and record" does not establish that the court relied on his entire prior criminal

19

record.  The court specified several times that it was basing its decision on the increasing seriousness of Tate's crimes as demonstrated by the prior conviction he admitted coupled with the current offenses against Doe.

In summary, the trial court was very specific and thorough in explaining its reasons for selecting the upper term for count 2.  And we appreciate the trial court's efforts in this regard, as we can easily follow the court's reasoning.  We see no ambiguity in the record regarding the reasons the trial court imposed the upper term on count 2 and the corresponding enhancement.  Tate has not shown any error in his sentence.

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DATO, J.