Filed 7/16/25  P. v. Kolehmainen CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BENJAMIN JAMES KOLEHMAINEN,<br><br>    Defendant and Appellant. | F087788<br><br>(Super. Ct. No. BF192903A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Lewis A. Martinez, William K. Kim and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Benjamin James Kolehmainen appeals the trial court's imposition of a consecutive term for an enhancement that required the jury to find his victim experienced

a coma or was in a comatose state before he died. Because we cannot conclude substantial evidence supports this particular finding, we strike the sentence enhancement imposed and remand this matter for resentencing.

## PROCEDURAL SUMMARY

An amended information was filed on January 29, 2024, charging defendant and two other codefendants with willful, deliberate, and premeditated murder (Pen. Code,[1] § 187, subd. (a); count 1) and assault by a prison inmate by means of force likely to produce great bodily injury (§ 4501, subd. (b); count 2).[2] The amended information also contained enhancement allegations related to count 2, stating defendant personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)), that caused the victim to become comatose due to the resulting brain injury (§ 12022.7, subd. (b)).

Following a jury trial, defendant was found guilty on count 1, but for the lesser included offense of involuntary manslaughter. On count 2, the jury found defendant guilty of assault by a prison inmate by means of force likely to produce great bodily injury. The jury also found true the enhancing allegations connected to count 2, that defendant personally inflicted great bodily injury upon the victim, and that the victim became comatose due to the resulting brain injury. On February 20, 2024, a court trial was held to address various aggravating factors alleged in the amended information. Following the court trial, several of which were also found true.

Defendant was sentenced on March 19, 2024, to a total term of nine years in state prison. The court selected count two as the base term for defendant, imposing the middle term of four years, then added an additional consecutive term of five years for the section 12022.7, subdivision (b) enhancement. The court imposed, but stayed, the upper term of

---

[1]    All further statutory references are to the Penal Code.

[2]    The two codefendants are not part of this appeal.

2.

four years for count 1, citing section 654. The term of three years for the section 12022.7, subdivision (a) enhancement was also imposed but stayed.

## FACTUAL SUMMARY

The only question posed to this court is whether the evidence presented at trial supports the jury's finding Michael Iverson, the victim in this case, became "comatose" as a result of a brain injury caused by defendant and his two codefendants. Because the jury found this allegation true, defendant's base sentence of four years for involuntary manslaughter was enhanced by a consecutive term of five years pursuant to section 12022.7, subdivision (b). Our summary of the facts will, therefore, focus on the facts necessary to resolve this specific issue.

On March 7, 2022, two correctional officers employed at Wasco State Prison witnessed defendant and two other inmates, "battering" Iverson, who had just been moved to their unit of the prison. One officer described the incident as a "three-on-one" fight.

Officer Eduardo Vasquez testified that when the attack started Iverson was standing but fell to the ground as the three inmates hit him with "[c]losed fists, striking him with force." Vasquez described how the inmates were "simultaneously striking Inmate Iverson in the facial area and upper torso." Vasquez stated Iverson did not fight back, but he attempted to protect himself by covering up his face with his hands. The inmates kept striking Iverson while he was on the ground. Furthermore, even after being told to stop, the inmates did not stop hitting Iverson until Vasquez used his pepper spray. Vasquez identified defendant as one of the inmates striking Iverson with force on that day. After Iverson fell to the ground, Vasquez never saw him move. Officer Herbert Flores confirmed these observations in his own testimony to the jury.

After the attack was stopped, Vasquez testified he approached Iverson and found him "proned out on the ground" "on his right side unresponsive." Vasquez stated he then checked Iverson for some type of response, or movement or breathing, and when he

3.

found none, he laid him on his back and started to administer CPR. He did not perform mouth-to-mouth resuscitation. Vasquez continued CPR until staff arrived about a minute later, who then took over the effort to revive Iverson with defibrillator pads. All efforts failed. When asked at trial how Iverson responded to being moved before he administered CPR, Vasquez stated Iverson was unresponsive and motionless. Correctional officers who were called in to investigate the incident later that day both stated Iverson was already dead by the time they arrived at the facility.

Robert Whitmore, M.D., a forensic pathologist employed by the Kern County Coroner testified he was initially struck by the surprising lack of external trauma to Iverson's body. Whitmore did note that there was evidence of a small hemorrhage in Iverson's left eye, which was more consistent with strangulation. However, Whitmore testified that the autopsy he performed revealed the existence of "subgaleal hemorrhages" located under Iverson's scalp, along with brain swelling which he believed was caused by blunt force trauma. Whitmore stated the type of hemorrhaging Iverson displayed on both sides of his head was "one of the worst cases I've ever seen." Based on the injuries he observed, Whitmore was of the opinion Iverson's cause of death was due to "blunt force head and anterior neck trauma." Whitmore was not asked, and offered no opinion on whether Iverson was ever comatose.

**DISCUSSION**

Defendant received an additional five-year consecutive sentence because the jury found that he personally inflicted great bodily injury upon Iverson that caused him to become comatose as a result of the brain injury. While a review of the record reveals overwhelming evidence to support the conclusion defendant personally inflicted great bodily injury, and that Iverson suffered a brain injury, there was no evidence presented to the jury establishing Iverson was ever in a comatose state before he died. In fact, the word comatose or coma was not mentioned by any lay or expert witness at trial. Case law has held "there must be evidence showing the victim was comatose at some point."

4.

(*People v. Delgado* (2013) 213 Cal.App.4th 660, 667; see *People v. Tokash* (2000) 79 Cal.App.4th 1373, 1378.)

The question we must address, therefore, is whether "substantial evidence" was introduced to support the finding that Iverson was comatose for some period before he died.

I.     DOES SUBSTANTIAL EVIDENCE SUPPORT THE JURY'S FINDING IVERSON WAS COMATOSE?

*A. The Standard of Review*

When considering whether a conviction or a finding on an enhancing allegation is supported by the evidence, this court must review the entire record to determine whether any rational trier of fact could find support for the essential elements beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The evidence must be "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid.*) When conducting this review the appellate court " 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Therefore, " '[w]e must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

We look only for substantial evidence; we do not consider conflicts in the evidence or weigh the strength of that evidence. (*People v. Navarro, supra,* 12 Cal.5th at p. 302.) The jury, not the appellate court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.) A reversal based on insufficient evidence is not warranted unless there is no

basis for concluding sufficient substantial evidence supports the jury's verdict. (*Ibid.*) The jury's findings on enhancement allegations are reviewed using the same standard. (See *People v. Wilson* (2008) 44 Cal.4th 758, 806.)

       *B.  The Element of Being "Comatose"*

       The most recent published opinion addressing this specific issue is *People v. Cunningham* (2016) 244 Cal.App.4th 1049 (*Cunningham*), which notes:

> "Since section 12022.7, subdivision (b) does not define 'comatose,' we understand it to have the meaning it bears in ordinary usage. [Citation] Webster's Ninth New Collegiate Dictionary (1991) at page 262 defines 'comatose' as 'of, resembling, or affected with coma' or 'characterized by lethargic inertness.' The same source defines 'coma' as 'a state of profound unconsciousness caused by disease, injury, or poison.' (*Ibid*.) 'Unconscious,' as used in the phrase 'was unconscious for three days,' is defined as 'having lost consciousness.' (*Id.* at pp. 1284-1285.) Thus, a victim is comatose, for purposes of the enhancement, if she is in *a state resembling a coma characterized by profound unconsciousness*." (*Id*. at p. 1054, italics added.)

The *Cunningham* court found substantial evidence supported the finding the victim in that case experienced a comatose state based on evidence showing the victim had surgery to address a brain injury, which then required she be sedated to remain unconscious for a period of days. (*Ibid*.) In fact, the treating physician testified that the medications given to her were meant to suppress consciousness. (*Ibid*.)

       Conversely, in the earlier case of *People v. Delgado, supra*, 213 Cal.App.4th 660, the appellate court struck a finding the victim was in a comatose state due to a lack of evidence supporting that conclusion. The *Delgado* court specifically cited the testimony of a treating physician who described the Glasgow Coma Scale, which physicians use to grade degrees of brain impairment. Using that scale, the doctor declined to testify the patient was ever in a comatose state. (*Id*. at p. 668.)

       These cases hold there must be some evidence the victim actually became profoundly unconscious in a way that was related to the "great bodily injury" inflicted by

the defendant, whether that unconscious state was due to the injury itself or to a treatment used to treat that injury.

### C. Arguments of the Parties

During closing argument, the prosecutor argued that Dr. Whitmore testified that Iverson did not die immediately, but went comatose at some point on the floor. The record does not support this statement. In their appellate brief, the Attorney General argues that, based on the movement of Iverson's head after Vasquez turned the body over, evidence showing that defibrillator pads we applied, and the presence of a pacing pad, which is used to pace the heart, once you get it going, infers from this medical intervention that Iverson was alive after the attack.

Appellate counsel responded that defibrillators are not typically used on someone who has a pulse. They are designed to restore a heartbeat in someone experiencing cardiac arrest.

### D. Application

The jury was given CALCRIM instruction number 3161 addressing the language of section 12022.7, subdivision (b), and explaining the jury must consider whether defendant personally inflicted great bodily injury that caused Iverson to become comatose. The instruction went on to explain that the coma had to be the result of the brain injury that was inflicted by defendant. This was the only instruction given on the question of a coma or a comatose state related to a brain injury. No additional instruction was given specifically defining what a coma was or what a comatose state consisted of.[3]

There is no question substantial evidence supports the jury's conclusion defendant inflicted great bodily injury and that this act led to a brain injury to Iverson. However, there is a lack of any evidence showing Iverson experienced a comatose state because of

---

**3** Defense counsel objected to this instruction at the instruction conference, arguing there was no evidence in the record to support it.

7.

his brain injury. The question we must consider, therefore, is whether the evidence actually submitted allows us to logically infer such a conclusion. (See *People v. Navarro, supra*, 12 Cal.5th at p. 302.)

Unfortunately, *Delgado* and *Cunningham* provide insufficient guidance on this point. In *Cunningham* substantial evidence established the victim required surgery for the brain injury that then necessitated sedation to keep the victim unconscious for a number of days. (*Cunningham, supra*, 244 Cal.App.4th at 1054.) In *Delgado*, the appellate court reversed the trial court's imposition of this particular enhancement because there was no evidence in the record supporting the conclusion the victim was ever in a coma. (*People v. Delgado, supra*, 213 Cal.App.4th at p. 668.)

Our review of the record reveals that at no time was any evidence submitted addressing whether Iverson ever experienced a comatose state due to the beating he received from defendant and the other two inmates. Specifically, there was no evidence of a "profound unconsciousness." (See *Cunningham, supra,* 244 Cal.App.4th at p. 1054.) At most, the evidence showed that when the beating ended, Iverson was motionless, exhibiting no signs of breathing or movement. The pathologist who conducted the autopsy of Iverson's body concluded he died from blunt force trauma to the head and neck. He offered no evidence from which one could infer Iverson was ever comatose before he died. While CPR was administered to Iverson within minutes of the beating, there was no evidence suggesting or proving he was actually unconscious but still alive once the beating ended.

While there is no question Iverson was seriously injured and was not responsive after suffering a significant brain injury due to the assault, more was required under the language of section 12022.7, subdivision (b).

## DISPOSITION

The great bodily injury enhancement as defined in Penal Code section 12022.7, subdivision (b) is stricken.  We, therefore, vacate the sentence imposed and remand this matter for resentencing.  In all other respects, the judgment is affirmed.

FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.

9.